## THE SIR WILLIAM ARMSTRONG.

### MERRITT WRECKING ORGANIZATION v. THE SIR WILLIAM ARMSTRONG.

(District Court, E. D. Virginia. August 17, 1892.)

1. SALVAGE—COMPENSATION—ENFORCEMENT OF CONTRACT.
   A steamship bound to Havre from New Orleans, with a large cargo of cotton, stranded on the shoals 20 miles north of the Virginia capes during a storm. Intelligence of her situation and request for assistance were sent by a passing steamer to Norfolk, the nearest port. In response, libelants, who were considered the best equipped wreckers on the Atlantic coast, sent out two barges, with a total capacity of 1,800 bales, two large wrecking steamers, and three or four tugs chartered for the purpose, the whole being manned by a force of between 90 and 100 men. On arrival the stranded ship was found to have sunk 6 or 8 feet in the sand, with several feet of water in her compartments, in a helpless condition and a dangerous position. A salvage contract in writing was entered into with libelants by the captain, after consultation with the chief mate and engineer, and with the approval of all three, which, in substance, provided that the salvors, if successful, should have 25 per cent. of the value of the dry cotton saved, 40 per cent. of the value of the wet cotton, and 20 per cent. of the appraised value of the ship. The cost to the salvage company of the enterprise, after it was completed, was over $20,000. The work of the salvors was entirely successful. The ship and all the cotton, amounting to

5,271 bales, were landed safely in port. Three days after the contract was made the owners of the steamship were notified of its terms by the captain, and no objection was offered. *Held*, that the contract was reasonable, fair, and just, and should be enforced.

**2. SAME—DURESS.**

A contract for saving a ship, made out at sea by salvor with master and mates of the vessel, while the ship is in extreme peril, helpless, and in momentary danger of destruction, is not void as made under duress, where there is no intent on the part of the salvor to extort unjust compensation, and the terms are fair, and the amount promised in accordance with awards for like services by the admiralty courts.

**3. SAME.**

The defense on the part of the captain that the contract, by agreement, was to be regarded as only a matter of form, and that the compensation of the salvors was to be determined by the National Board of Underwriters, cannot avail in the face of the fact that a week after its date, in a letter to the wrecking company, he complains of the delay in "carrying out your contract," and in view of the further facts that during the whole progress of the work of salving the ship and cargo, embracing a period of 17 days, no objection was made or any intimation given that the contract was regarded as a matter of form.

**4. SAME—APPORTIONMENT BETWEEN SHIP AND CARGO.**

The ship's net tonnage was 1,386. The cotton saved constituted in weight 1,300 tons, which was to be handled in about 5,000 parcels of 489 pounds, each parcel or bale requiring to be handled three times. *Held*, that in the rates stipulated in the contract no discrimination was made in favor of the ship.

In Admiralty. Libel by the Merritt Wrecking Organization against the steamship Sir William Armstrong to recover on a contract for salvage. Decree for libelants.

Sharp & Hughes, for libelants.
Richard Walke, for respondents.

HUGHES, District Judge. About midday of January 19, 1892, the British steamship Sir William Armstrong, McKenzie, master, on a voyage from New Orleans to Havre, was driven in by heavy wind and sea, and stranded in the shoals which lie off Cobb's island, 20 miles north of the Virginia capes. Cobb's island is one of a series of large sandbars which line the Virginia coast in that region, being 6 or 7 miles out from the mainland. In very high seas nearly the entire island is swept by the waves. Shoals are formed east of it, and extend 4 and more miles into the ocean. Their bottom is very "lumpy" and of varying depths. Occasional inlets pervade them here and there, one of which extends inward along the southern end of the island, and a very irregular one leaves this, just southeast of the island, and runs in an ill-defined and crooked channel northeasterly out to sea. These inlets form, with the ocean, an irregular triangle, on the outer side of which the Sir William Armstrong stranded. She lay eastward of the southern end of the island, about 3½ miles out to seaward, 20 miles from the Virginia capes, 50 miles from Norfolk. She stuck fast in 7 feet of water. She had on a cargo of 5,559 bales of cotton, and drew 19 feet aft and 14 feet or more forward. Her net tonnage was 1,386, and her gross 2,179. Her length was 300 feet, her breadth of beam 37½ feet, and her depth of hull 24 feet. She is a compartment steamer, built with water-tight bulkheads between four cargo holds and the engine rooms, and between the cargo bunkers and main deck. There are four freight and one engine room compartment, the latter in the center of the ship. Telegraph wires were all down, and intelligence could not be conveyed to Norfolk of her

situation until the night of the 20th, when it was sent by a steamer bound in to Norfolk from New York. The libelants promptly sent out their wrecking steamer Rescue to look after and give assistance to the Armstrong. The Rescue arrived out at about 3 P. M. on the 21st. Between the 19th and this arrival the steamer had discharged a large quantity of coal, pumped out her ballast tanks, run a hawser and anchor out to northeast, and before the coming of the Rescue had worked her engines and set her sails, for the purpose of heaving on this anchor. In this effort the steamer had floated and backed herself off; but something had then given way, and she had fallen back and grounded again, the sea being very heavy. Later efforts had failed to move her, and on the morning of the 20th she had hoisted signals of distress, and in the afternoon had sent a message in for assistance, as before stated. The weather was freezing, and the sea breaking over the ship on the 20th; during which time she consumed all her rockets and distress signals without receiving any response. Finally she continued to signal by means of flare lights. During this day the crew, despairing of saving the ship, had petitioned the captain for leave to go ashore; but this purpose was relinquished in consequence of an abatement of wind and sea in the latter part of the day. Soundings around the ship showed a depth of 7 feet at low water. She had sunk several feet in the sand, witnesses varying from 3 to 10 feet in opinion, and was listed 4 or 5 feet to starboard. During these occurrences she had lost her stern post and rudder, and some 16 feet of keel, and, as afterwards appeared, her bottom had been considerably injured.

When the Rescue arrived, she was found to have 3 feet of water in her No. 3 compartment, and $2\frac{1}{2}$ feet in No. 4, both these holds being aft. She was most probably sunk 6 to 8 feet in the sand. The ship was helpless, and in a very dangerous position. The testimony of experienced wreckers who were examined is that it is much more dangerous for a vessel to be stranded 3 or 4 miles out among shoals than on a beach of the mainland. Lines cannot be run from them to a place of safety. Wrecking steamers cannot be got near them. Barges or surfboats have to be used. Risk of many casualties has to be run in stormy weather, and in case of accident the lives of all on board a ship are beyond the usual chances of rescue. The Armstrong was 10 miles from an inaccessible part of the mainland, 20 miles from the Virginia capes, 40 miles from Hampton roads, and 50 from Norfolk. The task of saving her was undertaken by the Merritts, who are the most completely equipped wreckers on the Atlantic coast. Their entire plant represents a capital of $600,000. The Merritts themselves, and most of their men, have an experience in wrecking, as a profession, of a quarter of a century. Capt. Coley, their chief manager, and Capt. Nelson, his assistant, are known to this court as men of the highest experience and skill in the wrecking business. These two men were deputed, in their respective ranks, as managers of the enterprise of saving the Armstrong and her valuable cargo. The property put at the disposal of these two managers of this enterprise was upwards of $200,000 in value. The libel states that the number of men employed under them was between 90 and 100. The

cost to the Merritts of the enterprise after it was completed was found to have exceeded $20,000.

Until recently, when cotton ships stranded and became subjects of salvage enterprises, it was the practice to lighter the cotton bales into surfboats, draw these by lines across the breakers to steamers lying in the offing, and send them into port; or, if the condition of the weather and sea permitted, schooners were brought alongside the stranded ships, and, when loaded with cotton, were taken in tow by outlying steamers and brought into port. The Merritts have devised, as a substitute for surfboats, very capacious barges of very light draught, propelled by their own steam engines and machinery, for the purpose of lightering stranded cotton steamers. Two of this class of barges were used in taking cotton off the Armstrong, viz., the Seymour, with capacity for 700 bales, and the Haggerty, with capacity for 1,100 bales. They employed in the same service their own two wrecking steamers, the Rescue and the Merritt, built for that specific business. These large steamers assisted and remained in the vicinity of the Armstrong while the service was going on; and three or four smaller tugboats, chartered by the Merritts for the occasion, were employed in towing the two barges, respectively, with their loads, from the Armstrong to Norfolk, and in bringing them back again.

On the arrival of the Rescue near the Armstrong, on the afternoon of the 21st, Capt. Coley went aboard. They were jettisoning cotton from the ship at the time, and had thrown about 220 bales overboard. Capt. Coley at once advised a discontinuance of this work, and it ceased. After conferring with Capt. McKenzie, they agreed upon the terms on which Capt. Coley would undertake the saving of the ship and cargo, which were put in the form of a written contract, which will hereafter be considered. In substance, the contract provided that the salvors, in the event of success, should have 25 per cent. of the value of the dry cotton saved, 40 per cent. of the value of the wet cotton, and 20 per cent. of the value of the ship. This contract was entered into by Capt. McKenzie after his chief mate and chief engineer had been called into consultation, and with the concurrence and approval of all three.

When Capt. Coley first got to the Armstrong, he did not expect to save her. The reason was, as he says, that she had water in her; that she was on a shoal out some miles from land, where barges would have to be used, where steamers could not come near her, and where it would be tedious labor to get barges alongside, in consequence of the tide running across the shoals. The ship was high up out of water on the shoal, and much harder to be got afloat than if she had been on a beach nearer firm land. If she leaked, the pumps would be of little use after she got to rolling, as the loose cotton in the ship would get into and choke the pumps, and this ship had a very unusual quantity of cotton to handle before she could be saved. Capt. Nelson says:

"I was scared of my life all the time I was there. It is a dangerous shoal, and about three miles from land, and a low, sandy beach, and if that ship went down you would perish before you could get to land. If the ship broke up, there was no protection for the men; they couldn't get anywhere."

Without going into detail as to the manner in which the work progressed, it is sufficient to say that, by alternating the two barges, the Seymour and the Haggerty, one of them taking cotton bales off the Armstrong while the other was towed to Norfolk, discharged, and returned, the ship was entirely cleared of cotton between the 24th of January and 3d of February, except as to less than a hundred bales, which were got off on the 5th of February. The cotton was all got off, to the number of 5,271 bales, in the course of about 10 days, the two barges making each four trips to Norfolk. No casualties happened to the cotton taken off. All was landed safely at Norfolk; all of it entirely unimpaired in handling, except about a dozen bales used as fenders between the barges and ship during the process of lightering. One of the salving party injured himself during the service, and died of his injuries. Capt. Coley and some others were severely injured.

The operations of the salvors were greatly favored, most of the time, by the weather, which was fine almost beyond precedent for the season. But for this circumstance the enterprise could hardly have been so completely successful as it was. There was one spell of bad weather which occurred on the afternoon and night of the 30th of January. The wreckers endeavored to avail themselves of the high sea that then came on to heave upon the several anchors which they had planted out to seaward, and to get the ship out of the bed of sand where she had lain. By force of the ship's engines and the wind they succeeded in floating the ship, and in getting her well in motion, in tow of the Merritt; but it was the judgment of both Capt. Coley and Nelson that if she went out on the breakers she would be in danger of pounding herself to pieces on the bottom before she could be got out to sea; and so, after floating her as described, on the night of the 30th, they determined to cut her loose from the tow, and let her drift to westward. When this was done, she went back for half a mile before grounding. When she did come aground, she was found to be within 200 fathoms of the inlet that has been described as running in to the south of Cobb's island.

This fortunate circumstance rendered it practicable to heave her over into this channel, which work was accomplished in a day or two. When once in the inlet, the ship floated at ease. There all the cotton remaining in her holds were lightered off on a barge. Then the inlet which has been described as running up northeastwardly from the first one to deep water was sounded and buoyed, after which the ship was towed through it to sea, and, by the aid of the two wrecking steamers and two of the tugs which had been chartered, was towed to Norfolk, where she arrived on the 10th of February, 17 days after the salvage service had been entered upon by the libelants. The enterprise had been completely successful, the ship and all the cotton on her when taken in hand having been saved; neither ship nor cargo being in a more damaged condition than when the service was commenced, on the 22d of January.

Much the larger portion of the evidence taken in behalf of the respondent consists of objections and complaints against the salvors for imputed tardiness in conducting their operations, from the alleged want of a

greater number of barges than the two that were employed, and a greater number of men. These objections seem to have been stimulated by a man by the name of Steele, and an agent of a small portion of the under-writers, named Coe, who made an expedition to the place of opera-tions, and were on board the Armstrong for one or two days. A great deal of the evidence of the libelants is taken up with refutations of these complaints. The complaints were made by men confessedly inexperi-enced in wrecking work, and especially so in the wrecking that is done on the Virginia and Carolina seaboard. The testimony of Capts. Coley and Nelson, and several of their men, taken in reply to these complaints, seems to me to show very plainly that they were made in ignorance of the wrecking art, and of the plan on which these wreckers operated, and of their reasons for the several measures which they took. But the voluminous testimony alluded to, whether taken on one side or the other, becomes practically immaterial, in the light of the complete suc-cess of the enterprise. A sufficient answer to all complaints of the sort mentioned is that the ship and the cotton were saved from ex-traordinary peril with extraordinary completeness. Finis coronat opus. Although a harmless, it is an ungracious, pastime to abuse the bridge that carries one safely over trouble. I have not thought it neces-sary, in epitomizing the evidence taken in this case, to set out the imputations of dilatoriness, insufficiency, incompetency, and blunder-ing made by Capt. McKenzie against what he calls those "brutal wreckers," or the testimony in their own defense, given by a most worthy set of men, of undoubted skill, which constitutes, in my opinion, a full vindication of themselves. I pass, therefore, from the evidence in the case to the questions which it presents for decision.

The first question arising is whether the contract for salvage which was entered into between Capt. McKenzie and Capt. Coley before the salvage service began is to be enforced or ignored by the court. It is well-settled text-book law that the master of a vessel in distress may bind the owner by a salvage agreement in the absence of the owner; that it is competent for salvors, instead of leaving the amount of their remunera-tion to be determined by a court, to agree with the master of a vessel in distress to render the required assistance for a specific sum; and that, if a salvage agreement be proved, the court will enforce it, unless it be clearly inequitable; it being no answer to an agreement to say, on one hand, that it is too hard upon the salvors, or, on the other, that the salvage services were attended by less difficulty than was anticipated. It is just as well settled, on the other hand, that a salvage contract may, as any other contract may, be set aside on the ground of duress, or fraud, or deception, or gross exorbitancy, or other reason that may be pro-nounced sufficient by a court of justice. In this respect a contract of salvage stands on the same ground as all other contracts entered into be-tween parties sui juris, and therefore it is not because the contract now under consideration is a contract of salvage that it can be disregarded by the court. I will set out the contract in full. The evidence shows that it was signed on a printed form, and that the blanks in the form used

were filled up by Capt. McKenzie himself, in his own handwriting, except the signatures. I will italicize the words and phrases written by Capt. McKenzie:

"Application is hereby made for salvage assistance to the *British steamer Sir William Armstrong, of Newcastle,* whereof *John McKenzie* is master, which vessel, having on board a cargo consisting of *5,559 bales of cotton, shipped at New Orleans, bound to Havre,* now *stranded off Cobb's island,* which application is accepted by I. J. Merritt as salvor; it being understood that said I. J. Merritt shall have the requisite possession and control of the property, and be entitled to the reasonable use of the material belonging to the vessel, and to the aid of the crew. It is also understood and agreed that I. J. Merritt is to render the service on the following terms, and be entitled to the following compensation: First, that said I. J. Merritt, with proper dispatch, and at his own expense, is to send assistance to and endeavor to save said property, and deliver same, *Norfolk, Va.;* second, that I. J. Merritt shall be paid *25% on all dry cotton saved, 40% on all wet cotton saved, 20% on value of the steamer when saved, at appraised value;* third, that the compensation, if not agreed upon as above, shall be such as is just in the premises. Dated *January 21st, 1892,*

"Vessel, by *John McKenzie.*
"Cargo, by *John McKenzie.*
"*Wm. Coley,* Salvor.
"*Robert Thompson, 1st Engr.*
"*Thomas S. Knill, 1st Mate.*"

Counsel for respondent object to this contract on the ground that, by the rates stipulated to be paid, discrimination is made against the cargo in favor of the ship. I do not think such discrimination is shown. The ship's net tonnage was 1,386. It so happened that the cotton saved, all told, constituted in weight about the same avoirdupois, or some 1,300 tons. This quantity was to be handled in upwards of 5,000 parcels, (bales,) of 489 pounds each, each parcel needing to be handled three times, and was actually so handled; whereas the ship herself would be handled in solido, a single handling taking her into Norfolk. In towing the cotton to Norfolk, 100 miles were covered each trip. Certainly, if the single operation be worth 20 per cent. of the value of the large object saved in bulk, it does not seem exorbitant to have stipulated that 25 per cent. should be paid for saving 5,300 parcels, each requiring to be handled at least three times. The discrimination, on ordinary principles of business, would seem to be in favor of the cargo and against the ship, rather than otherwise. I think the objection of discrimination is refuted by the patent facts of the case, and is wholly untenable. No evidence was adduced to show that there was intentional discrimination.

Another objection to the contract is made by Capt. McKenzie himself. In substance, it is that when the contract was signed it was agreed by Capt. Coley that it was not to be really a contract, but that the terms of his compensation should be settled by the National Board of Underwriters; that the contract was to be regarded as only a matter of form. This is an attempt by Capt. McKenzie, not only to vary a written contract by evidence aliunde, which the courts very rarely permit to be done, but it is a self-stultifying objection. That he regarded the writing to be

a binding contract for some time after it was made is shown by a letter written by him to the Merritts on the 29th of January, a week after the date of the contract, complaining of delay on their part in "carrying out your contract." Three days after the date of the contract he telegraphed to his owners in England, informing them that he had made the contract, and describing its terms; and no objection to it has come from them. Nor is there any evidence that during the whole period of 17 days when the work of salving his ship and her cargo was going on, he made any objection to the contract, or gave any intimation or indication of his understanding that the contract was a mere matter of form. Capt. Coley, in his testimony, denies that anything was agreed upon or said to that effect, and it is not compatible with the good sense of the parties to the contract, as men of business, to suppose that the transaction was such a matter of child's play as Capt. McKenzie pretends that it was. If a solemn contract, made under the most serious circumstances, like the one under consideration, could be repudiated at pleasure by one of the parties to it, on such a ground as that insisted upon here, no contract could be relied upon as binding, and all the law of contracts, affecting so largely the affairs of mankind as that law does, would have to be treated as an idle jargon. Moreover, such an objection as that made by Capt. McKenzie here, after he has received the full benefit of a faithful execution of it on the part of the Merritts, involves a gross breach of faith on his part, and the court is not at liberty to entertain it. The objection, in order to have been relieved of this fatal taint, should have been made before the salvage service had materially progressed. It comes too late now. The court cannot entertain such an objection to the contract.

It is not pretended, and no evidence is produced to show, that the master was under duress in entering into this contract. From the first moment of his seeing Capt. Coley it was understood that the latter would enter upon the work of saving ship and cargo, whatever the terms might be. There was no threat of refusing to undertake the work unless the terms demanded were conceded. The contract was made in the confidence that the salvage enterprise would go on as of course, whether a contract was signed or not. By Capt. McKenzie's own testimony it appears that Capt. Coley agreed to receive a less percentage for the service than he originally demanded. It is also proved that Capt. Coley was unwilling to negotiate with Capt. McKenzie alone, but requested the presence of the chief mate and the chief engineer, as advisers of the master. The evidence also shows that all three of these officers of the ship expressed satisfaction with the compensation provided for by the contract as just and fair. In short, few cases have been reported in which a ship's master was so free from all duress as was Capt. McKenzie on the occasion under consideration. The contract seems to me to have been reasonable, fair, and just, receiving the free, full, and eager consent of the master of the ship. I will sign a decree allowing salvage compensation at the rates settled by the contract. The value of the cotton must be taken according to the estimate of Mr. Overton. The value of

the ship must be taken at $60,000. I approve of Mr. Stratton's method of arriving at this valuation, and disapprove of the method employed by Mr. Sanford, but will reduce the former's estimate, in deference to conflicting opinions.