## THE GUADALUPE.[1]

### (*District Court, D. Texas.* April, 1884.)

ADMIRALTY—SALVAGE—RULE FOR ESTIMATING.

In making up its judgment in an action for salvage, claimed for relieving a grounded vessel, the court inquires into whether or not the tugs employed performed only ordinary towage service; and, estimating the salvage earned, if any, considers how much danger and risk the plaintiffs incurred, the meritorious nature of their services, and the gallantry displayed.

In Admiralty.

*McLemore & Campbell,* for libelants.

*Ballinger, Mott & Terry* and *Hume & Shepard,* for respondents.

BOARMAN, J. The Guadalupe, an iron steamer of the Mallory line, of 2,190 tonnage, almost new, with powerful machinery, valued at $300,000, with a cargo and freight charges valued at $345,000, on the twenty-fourth of September, 1883, at 4:30 or 5 o'clock, A. M., ran aground on the sand beach at Bolivar peninsula, out at sea, about 15 miles from Galveston bay. The steamer, in an overcast and foggy night while running head on to the shore, at flood-tide, with wind blowing from the shore, firmly lodged herself on the ground, between 300 and 400 yards from the tide limit. I add an extract from the ship's log-book

"Sounding frequently. At 4:45 A. M. weather overcast and foggy on the horizon. Ship stopped and aground in 11 to 12 feet water; soft mud. Got anchor out and tried all possible means to get off. 10:30 P. M., got off with assistance of three tugs."

The ship's draught then was 12 feet 2 inches at the stem and 14 feet aft. Soundings made, as the captain says, just after the ship grounded, showed 10 feet water at the bow and 13 feet aft of the pilot-house and 14 feet at the stern. When the tide ebbed he said there was less than 10 feet at the stern. Going towards the shore the water seemed to shoal about 1 foot to every 100 feet. From the captain's evidence it clearly appears to me that the ship at low tide must have been lying on ground from stem to stern, and, I think, considering the draught of the vessel, his testimony will warrant the opinion that even at flood-tide she was lying from one end to the other on the ground. Whether such a conclusion may be justly drawn from what he says as to the soundings, the belief that the full length of the ship was on the ground *at highest tide* is fully sustained by the physical conditions and surroundings, supplemented as they are by the evidence of the ship's engineer and the several officers of the salving tugs.

None of the ship's officers say anything definitely as to the rate of speed she was running when she grounded or when the slow-bell was sounded. But, whatever may have been her speed at that time, it

[1] We are indebted to Talbot Stillman, Esq., of the Monroe, Louisiana, bar, for this opinion.

appears that the bell for stopping the engines did not strike until the ship was in shoal water, less in depth than her draught, and that her movement forward towards the shore was checked and stopped by the ground under her, rather than by her engines. The ship's speed per hour is 11 miles. The engineer says when she is going at full speed she can be stopped in five or six minutes; at half speed, in two or three minutes. Considering the engineer's evidence as to the time (if there was any) the slow-bell and stopping-bell sounded, and the time required to check or stop the ship at full or at half speed, the ship, steaming head on the shore at either rate of speed mentioned, must have advanced into shoal water a distance greater than her length; and these considerations also suggest that when she stopped on a full tide,—which rises about 15 inches perpendicular,—her entire length must have been on the ground.

The captain says he continued to do all he could to withdraw the vessel from her fastenings until 11 o'clock A. M., when, finding that he could not move her, he sent the ship's mate overland to Galveston with a message to the ship's agent. The mate reached Mr. Sawyer, the agent, about 4 or 5 o'clock P. M., and he at once saw the agent of libelants. Sawyer, without telling libelants what particular service he wanted the tugs to perform, requested and directed them to be made ready as soon as practicable to go outside of the bar with him to the assistance of the Guadalupe. The steam-tugs Laura, Maddox, and the pilot-boat Mamie Higgins, and the steam-tugs Bessie and Buckthorne, the latter with a lighter in tow, being equipped and made ready as soon as practicable, got under way about 6 : 30 o'clock P. M., and proceeded, under the general charge and control of Sawyer, who went out on the Higgins. All of these tugs are engaged usually in lightering ships at the bar, and were as valuable and powerful boats as are usually employed in their line of business. The three first named tugs reached the ship about 10 o'clock P. M.; the others did not get up in time to render any service in releasing the vessel. But this fact does not deserve particular notice, because the libelants pray for a reward in gross. When the tugs reached the ship, she was lying stranded, just as she was when the mate left her, 11 hours before. The wind was from the shore, and the tide was about as full as it was when the ship grounded. The ship's captain says the vessel moved for the first time when the tugs came alongside of her, and adds that this movement, observed by him then as the first time she had moved since he abandoned all effort to release her, may have been caused by the approach of the tugs. The Laura's captain, having taken his vessel closest to the shore, says he sounded about 30 feet in front of the Guadalupe and found less than 8½ feet; and in sounding along-side, about the same distance from the stern of the ship, he found 10 feet of water. The tugs found the ship lying fast aground, where she had been for 17 hours, unable, as her captain admits, to move by any force of her own, or by the fa-

voring force of the tide and wind. Under the direction of Sawyer, the three tugs were lashed to the ship, and after the full power of these tugs had been applied for 15, 20, or 30 minutes to move the vessel she found relief, and moved off, uninjured, into deep water, on her voyage to Galveston. Until the tugs reached the ship no one in the interest of the libelants knew anything of the condition of the distressed steamer. Sawyer, acting for the ship, demanded the services of the tugs, and in every way practicable they responded, without knowing or asking anything about the signal or message brought from the ship to her agent. Sawyer, being deeply interested in forwarding all possible aid for the ship's relief, hurriedly took charge of the tugs, without thinking it necessary to communicate to libelants any information as to the ship's condition, or to discuss with them the nature of the services required, or the amount to be paid for the work. At the time he applied for the services of the tugs there were not enough men on them for such services as might become necessary, and Sawyer furnished a number of men for the crews on the tugs. As there was no "lighterage work" done, I think it not necessary to refer more particularly to this fact.

I think this statement of the case substantially covers all the facts which are necessary to enable me to apply the law and make a decree responsive to the issues presented in the pleadings.

The libelants claim a salvage reward of 10 per cent. on the gross amount, $45,000. The respondents, offering to pay a liberal *quantum meruit*, contend that the services performed do not in law entitle libelants to salvors' compensation, because the ship was not in peril; that the ship would have avoided all injury and found a speedy relief or release from her ground fastenings by the use of her own power and favor of a flood-tide without the assistance of the tugs, which, in fact, reached her just as she was, by the use of her own power, effecting or about to secure her own release; and, further, libelants are not entitled to anything more than a *quantum meruit*, because, if such work was performed in the ship's interest, she not being at the time in peril, as is shown by libelants' testimony, the services were only such as the steam-tugs perform in their every-day business, and they should not be allowed salvage compensation.

In reply to the suggestion made by respondents that the Guadalupe was not in peril when the tugs came up to her, it may be remarked that the true element of a ship is in the sea, and her life is only full and complete when she is riding in deep soundings, at anchor, or when she can respond and move at her master's will on the ocean in pursuit of her useful purposes. And when such a ship, at a time marginal to the equinoctial period, is found in the shoal water of the Mexican gulf, with the full length of her flattened bottom pressed by her great weight into the sand, unable, by the application of all her great power, supplemented by favorable tides and winds, for 17 hours to move herself, it cannot be said that she is free from

serious distress, though the sea and the conditions about her may give no perceptible evidence of immediate peril. The proof shows that she did not and could not, with favoring tides and winds, move herself for 17 hours; and under such circumstances the conclusion cannot be avoided that she was in distress, and that the peril attending such a ship was much more than a possible danger.

It cannot now be determined whether the ship, unaided by the tugs, could, or would have, in an hour, in a few hours, or in a few days, effected her own release from the sand-bed in which she was lying when the tugs came to her aid, as is so earnestly contended for by respondents' counsel. But it is clear from the proof that she was lying helpless, out of her element, and unable to respond to her master's purposes when the tugs were lashed to her sides, just as she was when the captain, in despair of securing her release, dispatched the mate with his message for relief to Galveston. I think it is also clear that she moved off into deep water only when and after the tugs supplemented the power of the ship's machinery with the full force of their combined effort to move her. The testimony on this point is conflicting, and but little proof can be extracted from it; but it is the duty of the court to apply the proof, however little there may be on the point, rather than to follow the speculations of the captain, when he, in his depositions, read on the trial of this cause, says the ship would have been released if the tugs had not come there. Especially should the court hesitate and refuse to abandon whatever proof there may be on this point, when it is borne in mind that the captain noted in his log-book, at a time when it is likely no thought of a controversy like the present one was in his mind, these remarks: "Ship stopped and aground in 11 to 12 feet water; got anchor out and tried all possible means to get off; *10:30 p. m. got off with assistance of three tugs.*" Further, it appears to me, for the ship's captain to say, as he does, in the face of the admitted fact that the tugs applied their full force for a space of 15, 20, or 30 minutes before the ship begun to move, that the ship would have released herself in any given time, is as groundless a speculation on his part—and he is the only witness that indulges such an assertion—as it would have been for him, or any other weather prophet, to say, at the time the tugs came up, that the calm sea, then smooth and quiet, would not, in the same given time, be lashed by a September storm into a fury that would have driven the ship broadsides further on the dangerous shore. The tugs, though responding at once to a call for aid that took them out of, and a distance away from, the safety of the harbor, their usual field for labor, were in little more danger at any time while so employed than they were when engaged in lightering ships at the bar. But these tugs, in consequence of the character of the work they are ordinarily engaged in, cannot secure insurance against loss of any kind, and it may be said that the libelants' danger of loss is increased in some degree whenever they cross the bar in pursuit of any unusual purpose.

The fact that no great danger attended the performance of the service rendered in this case, does not of itself take from the service its salvage character, or make the work performed for the Guadalupe only such labor as the tugs usually perform.

The question whether any serious danger, great fatigue, or gallantry on the part of the salvors attended the performance of a valuable and useful service, may be and should be considered by the court in estimating the sum which should be allowed for reward. If none of these conditions characterized the valuable service in this case,—and I think they did only to a limited extent,—the service was not, technically speaking, very meritorious.

Believing that the service rendered the distressed ship was not simply towage service, nor a work performed in the line of the everyday business of these tugs, I shall consider the libelants as salvors, and allow a compensation reward based on well-established facts, which show that the libelants rendered a salvage service, though not of a very meritorious degree. A decree in favor of libelants for $8,000, with 8 per cent. interest from date of demand, will be entered.