THE ELFRIDA.[1]

PYMAN et al. v. CLARKE et al.

(Circuit Court of Appeals, Fifth Circuit.    November 17, 1896.)

No. 458.

1. SALVAGE—CONTRACTS FOR COMPENSATION—POWER OF COURTS TO SET ASIDE.
   While a contract for salvage compensation will be enforced when the salvor has not taken advantage of its position to drive an unreasonable bargain, yet the admiralty courts have long exercised the power to set aside agreements for excessive salvage compensation; and it is not necessary, in order to avoid such contract, that the shipowners shall show such fraud or duress as would vitiate a contract at law, or produce evidence sufficient to justify a court of equity in granting relief from a contract.

2. SAME.
   A contract for $22,000 for getting off a steamer worth about $70,000, which had gone aground at Velasco, Tex., in a position of little danger, in the late fall, when the weather is nearly always mild, and the wind light, and generally blowing off shore (which conditions actually prevailed in this case), *held* excessive, on appeal, and a decree for that sum reduced to $10,000; it appearing that the master was young, inexperienced, and unacquainted with the coast; that, while in communication by telegraph with the owners, he failed to disclose to them the fact of an offer to salve the vessel for a sum to be awarded by an admiralty court; that the service required but 15 or 16 men, a tug, barge, and small schooner, with anchors and cable; that the time consumed, including the period of preparation, was only three days, and that there was no danger to life or property, and no application of unusual skill.    Pardee, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Eastern District of Texas.

This was a libel by Charles Clarke and Robert P. Clarke against the steamship Elfrida (Pyman, Bell & Co., claimants) to enforce a contract for salvage compensation. The district court rendered a decree for the libelants in the sum claimed, and the claimants appealed.

J. Parker Kirlin (Convers & Kirlin, William B. Lockhart, and Guy M. Hornor, on the brief), for appellants.

James B. Stubbs, for appellees.

Before PARDEE and McCORMICK, Circuit Judges, and SPEER, District Judge.

SPEER, District Judge. The Elfrida was in ballast bound for the port of Velasco, Tex. This was on the 5th of October, 1895. The Elfrida is a British steamship of 1,454 tons net register, 290 feet long, 38 feet beam, and 20 feet 1 inch in depth. Velasco is a Texas port, a few miles from the mouth of the Brazos river. In order to increase the depth of water at the mouth of the Brazos, with the consent of the government of the United States, a corporation has constructed jetties extending from either bank of the river about a mile out into the waters of the Gulf, and the outer ends of the jetties, for a distance of about 2,000 feet, are submerged. In the afternoon of the date above mentioned the Elfrida was pursuing her way

[1] Rehearing denied without opinion January 26, 1897.

up the channel in charge of a duly-licensed pilot. She had the advantage of a moderate sea, but there was only five inches between the bottom of the vessel and the bottom of the channel. She was in about mid-channel, when she suddenly grounded aft, and the wind on her starboard brought her bow upon the submerged western breakwater. The master of the Elfrida at once ran out a kedge anchor from the starboard bow, and hove taut the line thereto with windlass, the engines going full speed, but could not move the ship. This effort was made with the obvious purpose to haul the bow of the Elfrida away from the jetty, but it resulted unfortunately, for the effect of the easterly wind and rising sea swung the steamship broadside to the jetty. On the next day, the weather having slightly moderated, the master of the Elfrida put out the starboard bow anchor with 50 fathoms of cable, and again hauling the cable taut, waited until high water. This came at about 8 p. m., when the distressed master, after heaving on the anchor and working the engines according to his best judgment, finally concluded to pump the water ballast out of the No. 3 tank, when the ship, thus lightened, drifted over the jetty, and grounded on the landward side. He then let go the port anchor, to prevent her from driving further ashore. On the next day the cable chain parted, and the ship drifted further towards the beach. The wire rope aft also parted, and the anchors were, for the time, lost. From that time until the ship was floated, while there was some variation in the weather, nothing actually occurred which increased her danger. An examination of the ship after she was hauled off indicated that she had not been materially injured. At 7:30 p. m. on the 17th day of October the Elfrida was floated, and proceeded to sea under her own steam to await daylight, so that she might safely enter the river. The manner of her rescue and the amount of compensation which should properly be awarded the salvors therefor occasioned a controversy which caused a libel in rem against her to be filed in the district court for the Eastern district of Texas. The owners, Pyman, Bell & Co., of Newcastle-upon-Tyne, claimed the Elfrida, and resisted the proceedings. On the trial the district court rendered a decree for $22,000 and costs against the vessel and the sureties on the bond by means of which she had been released from the custody of the marshal, and from this decree the claimants entered an appeal to this court. The appellants filed numerous assignments of error, but a majority of the court think that the cause may be tried without specific reference to each and all of these.

Definition and analysis of the law controlling the amount of the award in a case of salvage has been frequently made. In addition to its paramount definition, much eminent authority upon this topic is cited by the supreme court of the United States in the case of Cope v. Dock Co., 119 U. S. 628, 7 Sup. Ct. 336; but perhaps the statement which is the most comprehensive is that given by Sir William R. Kennedy, one of the judges of the queen's bench division, in his recent work "The Law of Civil Salvage." Some circumstances are always material for consideration, and these have been ascertained by experience, and the court has for its guidance a long

course of judicial decisions to assist it in coming to a proper conclusion in each particular case. These material circumstances which Dr. Lushington, in his judgment in The Charlotte, 3 W. Rob. Adm. 68–71, calls "the many and diverse ingredients of the salvage service," it is necessary now to consider in detail. These may be classified as follows: (a) As regards the thing salved: (1) The degree of danger to human life. (2) The degree of danger to property. (3) The value of property salved. (b) As regards the salvor: (4) The degree of danger to human life. (5) Their skill and conduct. (6) The value of the property employed in the salvage service. (7) The danger to which the property is exposed. (8) The time and labor expended in the performance of the salvage service. (9) Responsibilities incurred in the performance of the salvage service; such, e. g., as risk to the insurance and liability to passengers or freighters through deviation or delay. (10) A loss or expense incurred in the performance of the salvage service; such, e. g., as detention, loss of profitable trade, or repair of damage caused to ships, boats, or gear. Under this subdivision Mr. Justice Kennedy makes an observation similar to that made by the supreme court in the case of Cope v. Dock Co., supra, as follows:

"Where all or many of these elements are found to exist, or some of them are found to exist in a high degree, a large reward is given. Where few of them are found, or where they are present in a low degree, the salvage remuneration is comparatively small." Kenn. Civ. Salv. 119.

It is to be observed in this enumeration that the ingredient of first importance, both as regards the thing salved and as regards the salvor, is the degree of danger to human life. This was also announced by Lord Stowell, of whom a biographer has stated that: "The illustrious civilian must have possessed such a practical knowledge of shipping affairs as was probably never before attained by an advocate in the courts which he frequented." He had been born and bred in a seaboard town, Newcastle-upon-Tyne, which it is interesting to observe is the town of the appellants here; and his father, like them, had been actively engaged in its shipping interests, and he himself, after his father's death, carried these on. "What enhances," he declared, "the pretensions of the salvors most, is the actual danger which they have incurred. The value of human life is that which is and ought to be principally considered in the preservation of other men's property; and, if this is shown to have been hazarded, it is most highly estimated." The William Beckford, 3 C. Rob. Adm. 355–358. See, also, the opinion of Sir John Nichol in The Clifton, 3 Hagg. Adm. 117–121. The most recent expression in the high court of appeal by Lord Justice Lindsley, in the case of The City of Chester, 9 Prob. Div. 182–202, in no degree departs from the opinion of Lord Stowell above quoted. Said Lord Lindsley:

"The first matter of consideration is the nature of the service rendered, the dangers from which the one ship has been saved, and the danger to which the other ship has been exposed. Under this head have to be considered the skill and courage of the salvors, and the risk of life and death, as well to the saved as to the rescuers. A salvage service which hardly exceeds ordinary towage is

naturally remunerated on a very different scale from a heroic rescue from imminent destruction."

Critical scrutiny of the record of this cause will fail, we think, to discover any danger to the lives of the officers and crew of the Elfrida, or of persons engaged in floating her. The weather while the ship was stranded was moderate, and most of the time fine. There was always communication with the shore by means of a small boat. Indeed, it is not suggested that there was any danger to the life of anybody concerned. Said Dr. Lushington, in the case of The Thomas Fielden, 32 Law J. Adm. 61, 62:

"However great may be the danger to the property itself, if it is wholly unattended with the risk to human life, it assumes much less value than when under circumstances where human life is put in peril."

It follows, therefore, that the first and most important element which might otherwise "enhance the pretensions" of the salvors was wholly absent.

We will next inquire: First, what was the present, and, secondly, what the probable future, danger of the Elfrida herself? Most important, perhaps, in this connection was the state of the weather. We have stated, and it may be seen from the testimony of the master and many witnesses, the weather was moderate, and often fine, during the entire period that the Elfrida was aground. Great importance, in this connection, should be attached to the official weather report, which was in evidence. From this record, kept under the authority of law, it appears that the wind was blowing off shore during the time the vessel was on the beach, except on the afternoon of the 9th of October, and on the 10th, 11th, 12th, 15th, 16th, and 17th. The maximum velocity of the wind while the vessel was on the beach was 28 miles on the 8th of October, but, since the direction of the wind at that time was from the north, it was off shore, and could not affect her. While blowing on shore, the maximum velocity was 14 miles an hour, and the minimum 3 miles. It was clear all the while. An important feature is the testimony of Hutchins, a witness for libelants, who had been superintendent of the life-saving station on the Gulf of Mexico for 13 years. He testifies that the shore where the vessel stranded is very flat, sloping out gradually. A depth of 9 feet of water would not be reached inside of 1,200 feet from the shore, and a depth of 14 or 15 feet could not be attained at less than three-quarters of a mile. The breakers, he testifies, are in 12 or 16 feet of water, but only the spent force of the waves flows from that point upon the beach. Since the steamship was in 9 feet of water at high tide, it is plain that she was well inside the line where the force of the waves in the usual weather of that period of the year could have affected her with serious results. She was directly head on to the shore. She was erect, and lay easily in the bed she had made for herself in the quicksand which on that coast, unlike the sands of the Atlantic seaboard, had a tough, clay foundation. The tides could not have produced any material effect on her condition. We have the valuable assistance of the tide record, produced

and verified by the testimony of Lieut. Judson, of the corps of engineers, U. S. A. This was taken at Galveston, which differs little from those at Velasco, 40 miles away. The rise of the tide during the time that the Elfrida was ashore was from 2 feet 9 inches up to 3 feet 3 inches and down to 2 feet. It is expressly admitted in the amended libel that the vessel was lying in about 9 feet water at the highest point of high tide. The Elfrida was at no time seriously imbedded in the sand, and the ease and rapidity with which she was drawn off into deep water by the power of her own engines, attached with hawsers to anchors which were put out by the salvors, would seem to indicate that, had she herself the facilities for putting out her own anchors, she might have been floated without any assistance whatever. It is true that a dangerous storm from the southward was possible, but the official records kept at Galveston indicate that for the past 20 years the prevailing direction of the wind in the month of October was southeast; with an average velocity of only 10 miles an hour, and for the months of November and December the prevailing direction of the wind was from the north, and the average velocity was 9 or 10 miles. Further, it appears from the testimony of Hutchins, superintendent of the lifesaving station, who was perhaps the most experienced observer introduced by the libelants, that during the 13 years of his experience on that coast he had never known of an iron steamer which was stranded and lost. One, at a point 250 miles from Galveston, had been somewhat injured, but was rescued in 11 days. On the whole, it appears from the character of the bottom, the smooth waters and gentle winds which are to be expected in that soft climate in a month notable for its mildness, that the Elfrida was in little danger. The witness Smith, who testified for the libelants, stated with regard to that locality: "You can almost take anything off the beach. The question is whether it is worth it." Many of the witnesses testified that vessels ashore on the Texas coast work their way around in different directions for considerable distances, and are finally rescued. One witness, Smith, testified that it was much better for the vessel that she should be on the ground, because then she would not thump and hurt herself. "The way we do," he said, "when they begin to go aground, is to pump full their ballast tanks at once, so as to make them lie steady. When they lay in the bed of sand, they are better off than if they were rising up and down, and striking the bottom." The Elfrida aground had two feet less of water at her bow than at her stern, and in pulling her down the gradual decline to deep water it was as if she was sliding down hill.

Again, the amount of skill exerted by the salvors was nothing uncommon or extraordinary. A small schooner in tow of a tugboat conveyed the salvage equipment from Galveston to Velasco. In quiet waters, at Velasco, the anchors were transferred from the schooner to a barge, and from the barge were planted on the steamer's starboard quarter. The anchors of the Elfrida were planted on the port quarter, and the fifth anchor on the starboard side. Ropes and cables were attached to the chain cables and carried aboard the Elfrida, and each cable was attached to the drum of two winches,

and, as we have seen, the Elfrida's engines and steam, straining on the cables for about four hours, hauled her over the sands to deep water. Nor was the value of the equipment used by the salvors of special importance. A small schooner, chartered to take the anchors from Galveston to Velasco for the sum of $100, a barge said to be worth about $6,500, is about all of this plant concerning which there is definite evidence. The value of the anchors and cables used by the salvors is not given. There were 15 or 16 men employed; and, as we have seen, there was no unusual danger to either life or property, and the time and labor expended, including everything that was done from the 13th, when the salvors began their preparations in Galveston, until half past 7 o'clock on the 16th, was only three days. At the hour last mentioned the Elfrida was afloat, and proceeded to sea under her own steam. The actual time engaged in hauling her off the sand was about four hours. There was little responsibility, and no loss or expense other than that necessarily implied from the work of the salvors heretofore stated. It further appears from the evidence that in other respects the condition of the Elfrida was by no means unfavorable. She was only lightly aground, and at high-water mark her stern was afloat. By discharging her water ballast and coal, it is plain she might have lightened her draught so that she would not be aground, or, if aground at all, she would be resting very lightly on quicksand. She had sustained no injury. Her machinery, while strained, was in good working order, and possessed all its power. In a large measure, the jetties protected her from easterly winds. Had the winds blown from the north, it would have been distinctly favorable, and, had they worn around to the southward, scarcely less so, for at that season the evidence strongly indicates that severe winds were not experienced from southerly points. The official local forecast at Galveston for 20 years was in evidence, and it shows that the prevalent winds in the month of October were from the southeast, with an average velocity of only 10 miles an hour; and during the same period in the months of November and December the winds were from the north, with an average hourly velocity of 9 and 10 miles, respectively. Indeed, it is rarely the case that so many favorable conditions attend a vessel which needed salvage service. A. Covenney, the pilot, whose testimony, while offered for complainants, was strongly colored for the salvors, nevertheless stated that, had the vessel been supplied with suitable anchors and cables, he could probably have gotten her off with such a tide. This is, besides, plainly apparent from the ease with which the libelants floated her with no other power than that afforded by her own engines. Her value was about $70,000. It is contended by the appellees with great earnestness and ability on the part of their learned advocate in this case, that there was a definite agreement for salvage compensation, and that the court should not disturb it, although it may exceed the amount of what would otherwise be deemed as proper compensation, and the case of The Agnes I. Grace, 2 C. C. A. 581, 51 Fed. 959, and 2 U. S. App. 317, and other authorities, are cited in support of this proposition. The

language of Dr. Lushington, as quoted in the case mentioned, is as follows:

"When there had been a definite and distinct agreement, with ample time for the parties to consider what they are doing, the court would be reluctant to interfere with it."

This principle is otherwise expressed by the supreme court of the United States in Post v. Jones, 19 How. 150:

"Courts of admiralty will enforce a contract made for salvage service and salvage compensation where the salvor has not taken advantage of his power to make an unreasonable bargain."

While this is true, there is abundant authority for courts of admiralty to exercise the power of setting aside agreements for excessive compensation on account of salvage services. This principle was ascertained and clearly expressed very early in the evolution of the law. The small island of Oleron, off the west coast of France, the "Uliaras Insula" of Pliny, gave its name to the medieval code of sea laws described in the Black Book of the Admiralty as the "Laws of Oleron." The earliest text extant is in the handwriting of the fourteenth century, and is contained in the Liber Memorandorum of the Corporation of the City of London, and is preserved in the archives of their Guildhall. Judicial historians have stated that Richard Cœur de Lion, on his return from the Holy Land, remained some time in the Island of Oleron, and is entitled to the honor of producing these laws while there. It is, however, stated by Mr. Benedict, in a note to his valuable work on Admiralty, that Pardessus has clearly shown that the Laws of Oleron were not the production of Richard I. It seems to be accepted now that Eleanor, duchess of Aquitaine and Guienne, consort of Louis VII. of France, but subsequently divorced from him, and married to Henry II. of England, and who became the mother of the Lion Heart, having observed, during her visit to the Holy Land in company with Louis, that a similar collection of maritime customs and ordinances in the Catalan language, called "Lo Libre de Consulat," was generally respected in the Levant, directed that the judgments of the maritime court of the island of Oleron—at that time a peculiar court of the duchy of Guienne—should be made, that they might serve as law for the mariners of the neighboring seas. It is also accepted that Richard I. brought to England a roll of these judgments, which he published, and ordained to be observed as law. Enc. Brit. art. "Sea Laws." This interesting medieval compilation of maritime judgments announces this rule:

"And yf it were so, that the mayster and the marchauntes have promised to folke, that should helpe them to save the shyp and the said goodes, the thyrde parte or half of the said goodes which shuld be saved for the peryll that they be in, the justice of the country ought well to regarde what payne and what labour they have done in saving them, and after that payne, notwithstanding that promise which the mayster and the marchauntes shall have made, rewarde them. This is the judgment."

The principle of this sententious deliverance is universally accepted by the courts and announced by the text writers upon this

topic. Of such contracts, it is stated in 2 Pars. Shipp. & Adm. p. 306, that they are "enforced by the court only so far as it seems equitable, and conformable to the merits of the case, and are wholly disregarded if they are deemed unconscionable and oppressive to the owners of the property saved." In Jones, Salv. pp. 97, 98, it is said:

"The court will also refuse to recognize an agreement where the master improperly or recklessly contracts to pay the salvors an exorbitant amount. * * * If, on the other hand, the agreement should be unjust, or inequitable towards the salvors, the court will refuse to recognize it," and allow them adequate compensation.

In The Phantom, L. R. 1. Adm. & Ecc. 58, Dr. Lushington (page 61) said:

"However much it has been agreed upon by both parties, the court is in the habit of overruling such an agreement, if it is unjust and inequitable."

In his well-known work on Wreck and Salvage (section 119), Judge Marvin, who for many years presided in the district court of the United States at Key West, where numerous salvage cases were tried, uses this language:

"And such an agreement will not be binding upon the master, or owner of the property unless the court can clearly see that no advantage has been taken of the party's situation, and that the rate of compensation agreed upon is just and reasonable."

And the illustrious Story, in The Emulous, 1 Sumn. 207 (at pages 210, 211), Fed. Cas. No. 4,480, declares that:

"No system of jurisprudence founded upon moral or religious, or even rational, principles, could tolerate for a moment the doctrine that a salvor might avail himself of the calamities of others to force upon them a contract unjust, oppressive, and exorbitant; that he might turn the price of safety into the price of ruin; that he might turn an act, demanded by Christian and public duty, into a traffic of profit, which would outrage human feelings, and disgrace human justice."

The principle is also adopted by the imperial government of Germany:

"When, during the danger, an agreement has been made as to the amount of the salvage or payment for assistance, such agreement may nevertheless be disputed on the plea that the amount agreed upon was excessive; and the reduction of the same to an amount more in accordance with the circumstances of the case may be demanded." German Commercial Code, art. 743; translated in Wendt, Mar. Leg. (3d Ed.) London, 1888, p. 751.

See, also, The Ellen Holgate, 8 Fed. Cas. 509; The Rialto [1891] Prob. 175; Post v. Jones, 19 How. 150. In the case last quoted, the supreme court observes:

"Courts of admiralty will enforce contracts made for salvage service and salvage compensation where the salvor has not taken advantage of his power to make an unreasonable bargain; but they will not tolerate the doctrine that a salvor can take advantage of his situation, and avail himself of the calamities of others, to drive a bargain; nor will they permit the performance of a public duty to be turned into a traffic of profit. The general interests of commerce will be much better promoted by requiring the salvor to trust for compensation to the liberal recompense usually awarded by courts for such services."

Nor is it necessary, to avoid such a contract, that the owner should show such fraud or duress as would vitiate a contract at law. Sir William Kennedy, in his Law of Civil Salvage (page 208), states:

"It is not, however, it is submitted, only where it is proved that there has been unfair dealing in the shape of fraud or misrepresentation, or practical compulsion, that the court will interfere with an agreement which fixes a grossly excessive remuneration. Evidence of any such unfair dealing greatly strengthens, of course, the case against the agreement; but, even without such evidence, if it finds the exorbitancy to exist, however that exorbitancy originated, the court will, alike on principle and authority, be justified in setting aside the agreement."

Indeed, the jurisdiction of a court of admiralty to set aside an excessive salvage contract was exercised, as we have seen, in the time of Richard I., and it does not appear that contracts and other instruments were canceled by the courts of chancery before the reign of Henry VI., 2½ centuries later. 1 Spence, Eq. Jur. (Philadelphia, 1846) p. 624. We conclude, therefore, that the learned district judge was in error when he became of the opinion that he could not set aside the agreement for salvage except upon such evidence as would justify a court of equity in relieving a party from the obligation of a contract.

There remains to be determined whether the award of the circuit court should be reduced because the amount stipulated as compensation for salvage in the contract and allowed by the final decree is unreasonable, excessive, and oppressive. We have seen that the salvage services were neither onerous, arduous, responsible, dangerous, or unusually skillful, or long of duration. Nor was the master, when he agreed to pay the enormous sum of $22,000 for the relief of his vessel, on an equal footing with the experienced salvor, Clarke, who made the contract. Clarke was perfectly familiar with the coast. He knew the dangers and opportunities of success. His experience was great. He had never failed to float a ship on that coast. The master was a young and inexperienced man, only 28 years of age. The locality was unknown to him; and how his excitement, anxiety, and inexperience would enhance to him the dangers of the situation may be readily understood. He was informed by Clarke that sand would bank around his ship, and this did not appear to be true. It was made to appear to the master that Clarke and he only had the equipment for hauling the ship off. The danger of the Elfrida was greatly exaggerated. It is true that Clarke had originally offered to perform the service for what a court of admiralty would allow him, but we can well understand how alarming this proposition would be to the young master of the ship. The mention of litigation is terrible to a seaman, and the proposition was declined. But Clarke afterwards positively refused to render any assistance to the ship except upon a contract to pay $22,000 for the service, and Brock, who it seems owned the barge, gave the same refusal. The Galveston Lighterage Company was asked by the ship's agent if they would send tugs and appliances to Velasco to assist the ship, and, after consultation, they refused. To the

master it must have seemed that, if he failed to secure Clarke, his vessel was inevitably lost; and yet it is probable that he might have secured a lighter, planted his own anchors, and pulled his vessel off by the use of her engines, without any assistance from Clarke whatever. The owners of the ship also were ignorant of the true condition. The master was gravely in error when he failed to advise them that a tender had been made to perform the services for such a sum as the admiralty court would allow. It is clear that they would have accepted this proposition. They accepted the contract with the understanding that they had no other option, and it may be seen how desperate they regarded the condition of their vessel when they insisted that the salvors should take the vessel itself in certain contingencies. They testified that, if they had known that she was lying easily head on to the beach, with little or no accumulation of sand about her, with a depth of water only a foot less than her draught would have been with her ballast tanks empty, with fine weather, likely to continue, with no immediate danger, probably they would never have authorized the agreement for a sum so unconscionable. There are many cases where, for much greater services, and on much greater values, and with much more of difficulty and danger to the salvors, a less sum has been allowed by the court. Perhaps the most pertinent of these is The Hesper, 18 Fed. 696, decided in this circuit by the distinguished senior circuit judge. See, also, The Guadalupe, 20 Fed. 443; Pent v. Ocean Belle, 19 Fed. Cas. 200; The Diadem, 7 Fed. Cas. 632; The North Erin, 71 Fed. 430. Much reliance is placed by counsel for appellee upon the case of The Agnes I. Grace, 2 U. S. App. 325, 2 C. C. A. 581, and 51 Fed. 958. In that case, however, the ship in distress was a sailing vessel. She had, at high water, passed over shoals for more than two miles, where at low water the depth is only from one to three feet. She was exposed to the full force of the Atlantic. She was in quicksand, on a coast where it is universally true that a vessel so situated rapidly sinks out of sight. The case of the United States steamship Huron, off Kitty Hawk, and the ocean steamship vessel City of Savannah, ashore off Hilton Head, in their rapid disappearance from sight, are instances of the treacherous and dangerous character of the Atlantic quicksands. Besides, the Grace was 2½ or 3 feet in the sand, and a hole had been knocked in her bottom. The tide rose and fell in her hold. She was rapidly filling with sand. The salvors were engaged for several days in very dangerous work, both to themselves and very valuable tugboats, in the successful attempt to rescue her, and she was so damaged that it was only by the rapid and constant work of a powerful wrecking pump she was kept afloat at all. The value of the tugs and other equipment seriously jeopardized in her recovery were very much greater than the meager equipment used in the rescue of the Elfrida. The case, therefore, is in no sense parallel to that before the court.

For the reasons stated, a majority of the court are of the opinion that the decree of the district court should be reversed, and set

aside, and we find that a decree should be entered for the appellees for the sum of $10,000, which sum, in view of all the facts, we regard as ample compensation for the salvage services rendered. We further find that the appellants shall pay the costs of the court below, and the appellees the cost of the appeal. It will be so ordered.

PARDEE, Circuit Judge (dissenting). I do not discover that the nature and origin of the admiralty jurisdiction in salvage cases, or the general principles upon which admiralty courts make salvage awards, are involved in this cause. The question is in regard to the enforcement of an admitted salvage contract, and, as declared by the supreme court in Post v. Jones, 19 How. 150, 160, the law in that behalf undoubtedly is:

"Courts of admiralty will enforce contracts made for salvage service and salvage compensation, where the salvor has not taken advantage of his power to make an unreasonable bargain; but they will not tolerate the doctrine that a salvor can take the advantage of his situation, and avail himself of the calamities of others to drive a bargain; nor will they permit the performance of a public duty to be turned into a traffic of profit."

Our inquiry should be, to wit: As the circumstances were at the time the contract was entered into between the owners and salvors of the Elfrida, did the salvors take advantage of their power to make an unreasonable bargain, or, in other words, was the amount of salvage contracted for excessive, in proportion to the value of the property salved, to such an extent as to be unreasonable? The Agnes I. Grace, 2 U. S. App. 317, 2 C. C. A. 581, 51 Fed. 958. The Elfrida was aground within the limits of the port of Galveston and off the harbor of Velasco, upon a sandy beach, in water from 6 to 8 feet in depth, according to the tides, 1,000 feet distant from water of sufficient depth to float her, imbedded in sand about 2 feet, with a draft of 11 feet 10 inches, which could not be reduced by discharge of ballast or otherwise so as to get her off. The master has ineffectually attempted to pull the ship off with the aid of her own anchors, cable, gear, and a tugboat, but had lost an anchor and a cable, and had strained the ship's appliances; and the ship was practically helpless for 10 days before the contract for salvage was entered into. From the time the ship went ashore, the master was in communication with the agents of the ship and Lloyd's agent in the interest of the underwriters in Galveston,—all practically on the ground,—and by cable with the ship's owners. Before the contract for salvage was entered into, the master had opportunities to acquaint himself with the nature of the shore upon which he was stranded, and the surroundings and conditions, as well as the likelihood of the ship's being damaged or lost; and, besides the agents and owners above mentioned, the master had information and advices from pilots and masters of other vessels at Velasco in no wise concerned with or for the contracting salvors. During this time the libelants in the court below and the appellees in this court offered to the captain to undertake the floating of the Elfrida for such salvage compensation as the United States court would award if

they were successful. This proposition the master refused, and, instead, under the advice of his agents, called for tenders, as follows:

"Please tender for to float and place in a place of safety, say Galveston, where her bottom can be examined; furnishing diver and his apparatus; also to furnish all the material and labor in floating said S. S. Elfrida; also time required. Reply at your earliest convenience, under seal, to James Sorley, Lloyd's agent, or myself. No cure, no pay.

"Yours, truly,                                                        B. Burgess, Master.

"P. S. A convenient time to be allowed to get the ship off, and if, at the expiration of the time, the vessel is still aground, all claims of this contract to cease, and to be null & void.                                             B. Burgess, Master."

How many of these tenders were sent out does not appear, but the master, in response, received two propositions; one for the sum of $24,000, and one for $22,000. He cabled the lower proposition to his owners, and received instructions as follows:

"To Burgess, Steamer Elfrida, Velasco: Accept tender forty-five eighty if lower impossible. No cure, no pay. Try include in agreement, if steamer, after coming off, not worth amount salvage, steamer in damaged state to be taken in payment salvage.                                                    Pyman."

Under this instruction he entered into a contract with the appellees by which they bound themselves to float and place in a safe anchorage,—Quintana or Galveston,—as directed, the steamship Elfrida, furnish all labor and material at their own cost, furnish diver and necessary apparatus to survey and examine the bottom of said steamship, and complete the same within 21 days; otherwise no compensation for work performed, labor, tools, or appliances furnished. The master agreed to pay for such services the sum of $22,000, but reserved the right to abandon the ship in favor of the salvors in lieu of the said $22,000. At that time, according to the evidence, all parties thought the matter of floating the Elfrida would be a difficult and tedious work, necessarily taking time, and accompanied with great risk of success. That the master and owners so believed is shown by the fact that they required the salvors to do the work in 21 days, and stipulated for the option to abandon the ship in lieu of paying the salvage agreed upon; and that the contractors so believed is shown by the extensive preparation made to carry out their contract. The contracting salvors prepared a month's supply for their force, procured cables, gear, chains, anchors, two tugboats, two lighters, and two schooners, fully manned and equipped, and hired a large force of men. Some of the anchors and chains and the tugboats were the property of the contractors, but the schooners and lighters and other anchors and chains were hired. As to one lighter, at least, the contractors specially assumed the responsibility of all loss. The property thus prepared was worth about $50,000, was exposed to risk of loss or damage in the Gulf and by contact with the jetties and with and near the Elfrida among the breakers. About 5½ days were consumed in preparations and actual work. By means of the skill and experience of the salvors, with favoring weather, the Elfrida was floated. When afloat, she was worth, according to the evidence, from ninety to one hundred and ten thousand dollars. The only possible ground upon which

the amount of the salvage contracted for can be claimed to be excessive is because of the signal success of the salvors within the short time employed. The charges so recklessly made by the claimants in the court below at the collusion, fraud, overreaching, bad faith, and misrepresentation generally, are wholly unsupported by proof. The pretense that the master or owners were coerced into making the contract is absurd in view of the fact that Clarke & Co. offered to undertake the salvage without any contract, and for such award as the United States court might make. The amount agreed upon was not excessive; on the contrary, was low from the outlook before and at the time the contract was made. Since the successful rendition of the salvage services, in view of the preparations to that end, the extraordinary risks the contracting salvors were compelled to assume, the skill and experience employed, and the very important fact that the amount agreed upon does not exceed 20 or 25 per cent. of the salved property, I am clearly of opinion that the amount agreed upon is not excessive to any such extent as to be unreasonable. The judge of the district court found "from the evidence that said contract was a lawful contract, and that the same was entered into by the said master of said steamship with full knowledge or means of knowledge of the said master and of the owners of said steamship of all the conditions then existing, and that the amount named in said contract was not unreasonable under the said conditions." The judge evidently had read with appreciation The Agnes I. Grace, 49 Fed. 662, decided in the United States district court at Savannah, and he evidently attempted to follow the opinion of this court in the same case on appeal. The Agnes I. Grace, supra. In my opinion, he decided the case correctly.

How the discretion vested in the courts in matters of salvage contracts has heretofore been exercised by distinguished admiralty judges appears from the following extracts:

Mr. Justice Story, in Bearse v. Pigs of Copper, 1 Story, 323, Fed. Cas. No. 1,193, says:

"The situation of the parties, the nature of the service, and the absence of all controlling necessities, requiring immediate relief, on one side, at any expense and hazard, in order to escape from impending perils and calamities; and, on the other side, the absence of any duty to lend the required assistance, or any motive to take advantage of the necessities and urgencies of those perils and calamities, to drive a hard and unconscionable bargain,—these circumstances make it a case where the court not only looks with indulgence upon such a contract, but endeavors to fortify itself against the exercise of mere discretion by adopting and enforcing such a contract as equally just, moral, and conscientious."

Judge Brown, of the Southern District of New York, in The Alert, 56 Fed. 721, 724, says:

"In such contracts, so far as the element of a reward enters into the compensation allowed,—that is, an allowance wholly beyond the mere quantum meruit for the work and labor performed, as a reward given as a premium, on grounds of public policy, to encourage the maintenance of salvage equipments, and to induce speedy and heroic efforts for the safety of life and property,—this element cannot logically become a subject of barter, or of any irreviewable contract between the parties; since that would permit the parties to usurp pro tanto the functions of the court. but these considerations are applicable but slightly, if at all, to contracts which,

like the present, are made upon land, between parties dealing upon equal terms, with full opportunity for deliberation, with equal knowledge to the facts, and under the ordinary conditions of nonmaritime contracts. Such contracts should be treated like other voluntary, deliberate contracts for specific service. Bondies v. Sherwood, 22 How. 214; The Agnes I. Grace, 2 C. C. A. 581, 51 Fed. 959, and 2 U. S. App. 317."

Judge Longyear, of the district of Michigan, in The Silver Spray, 1 Brown, Adm. 354, Fed. Cas. No. 12,857, says:

"As the matter turned out, it was no doubt a hard bargain for the libelants. But I do not understand that a court of admiralty will set aside a contract for that cause alone, where it is free from all fraud, deception, mistake, or circumstances of controlling necessity. McArthur had ample time for consideration, and there is no pretense of any fraud or deception on the part of Moore or his agent, Reilly, or that McArthur did not know all about the situation, and the difficulties in the way of getting the boilers out; and there was no controlling necessity, of duty or otherwise, to undertake the job. The contract appears to have been entered into openly and fairly in all respects, and there is no principle or authority upon which the court can disregard it, or make a new contract for the parties."

Judge Hughes of the Eastern district of Virginia, in The Sir William Armstrong, 53 Fed. 150, says:

"It is well settled text-book law that the master of a vessel in distress may bind the owner by a salvage agreement in the absence of the owner; that it is competent for salvors, instead of leaving the amount of their remuneration to be determined by a court, to agree with the master of a vessel in distress to render the required assistance for a specific sum; and that, if a salvage agreement be proved, the court will enforce it, unless it be clearly inequitable; it being no answer to an agreement to say, on one hand, that it is too hard upon the salvors, or, on the other, that the salvage services were attended by less difficulty than was anticipated."

Judge Wells, of the district court of Missouri, in The H. D. Bacon, 1 Newb. Adm. 280, Fed. Cas. No. 4,232, says:

"The true principle by which such cases should be governed would appear to this court, with great respect for others, to be that established in like cases in courts of equity; that is, that a contract should be presumed prima facie to be fair, but, if proven to be unconscionable, the court of admiralty, like the court of equity, would refuse to enforce it."

Judge Speer, of the Southern district of Georgia, in The Agnes I. Grace, 49 Fed. 664 (where five-twelfths of the salved property was awarded as salvage), says:

"It is true, as insisted by the respondent's counsel, that a contract of this character is not binding upon the court, and that in all cases of salvage it is competent for the court to adjudge and assess the amount of the recovery in accordance with the equities of the case; and, if it should appear that a contract of this character was an inequitable one, the court would, of course, disregard it. But whenever a contract has been entered into after due deliberation by the parties, and has not been shown to be in any respect an inequitable one, it is exceedingly valuable as evidence to enable the court to arrive at a just determination. The court regards this contract as evidence in that light, and not as a conclusive contract; but it is a most significant and valuable indication of what should be the true amount of recovery."

In Jones, Salv. p. 99, the English rule is declared as follows:

"If a salvage agreement be proved, the court will uphold it, unless it be clearly inequitable; and it is no answer to the agreement to say that the bargain is a hard one upon the salvors, or that greater difficulties than were anticipated, in consequence of the change of weather, attended its performance; or that the weather became tempestuous; or the vessel was longer in arriving in port than

might have reasonably been expected. Nor, on the other hand, can the owner of the vessel receiving assistance refuse to pay the amount stipulated for on the ground that the salvage services were attended with less difficulty than had been anticipated, unless, indeed, the sum happen to be so grossly exorbitant as to amount to evidence of bad faith or fraud, which of themselves would induce the court to set aside the agreement."

In The Agnes I. Grace, supra, this court held that:

"Courts of admiralty will enforce contracts for salvage services and salvage compensation where there has been a definite, distinct agreement, with ample time for the parties to consider what they were doing, where the contract was considered by all at the time it was made to be fair and reasonable, and where the salvor did not take advantage of his power to make an unreasonable bargain."

If the rule unanimously declared by this court in the last-cited case is applied to the case in hand, the decree appealed from must be affirmed. A reversal of that decree, and a reduction of the amount of salvage stipulated in the contract, necessarily stamp the salvors with fraud and bad faith, and this, in my opinion, is wholly unwarranted by the evidence and circumstances of the case.

I have examined the adjudged cases cited in the opinion of the court as supporting the doctrine that a salvage contract may be disregarded under any and all circumstances when the court is inclined to think the amount of compensation agreed upon is too much or too little, to wit, The Phantom, L. R. 1 Adm. & Ecc. 58; The Emulous, 1 Sumn. 207, Fed. Cas. No. 4,480; The Ellen Holgate, 8 Fed. Cas. 509; The Rialto [1891] Prob. 175; Post v. Jones, supra,—and I find that, while detached expressions in the opinions rendered may apparently support the contention of my brethren, not one of the cases referred to warrants the abrogation of the salvage contract in the instant case unless bad faith and undue advantage are imputed to the contracting salvors; and in Post v. Jones, supra, the supreme court of the United States, whose decisions ought to be of controlling influence in this court, expressly declared that "courts of admiralty will enforce contracts made for salvage service and salvage compensation where the salvor has not taken advantage of his power to make an unreasonable bargain." In the present case it is undisputed that the contracting salvors offered to do the work, leaving the compensation to be settled by a court of admiralty, and that the master on shore, surrounded by his friends, and in full "communication with the world by rail and telegraph, in consultation with owners, and having every opportunity to inform himself as to the circumstances, called for competing bids, received more than one, and accepted the lowest in a contract which fully protected the owners, and threw all the risks on the salvors, with a time limit. It is an overdraft on my credulity to ask me to take the evidence in the record, and conclude that when the contract of salvage was entered into there was either undue advantage taken of power, collusion, or bad faith on the part of the salvor, or that the bargain made was unreasonable.