MERCANTILE TRUST CO. OF N. Y. *v.* MISSOURI, K. & T. RY. CO. *et al.*

*(Circuit Court, D. Kansas.   October 8, 1888.)*

1. RAILROAD COMPANIES—BONDS AND MORTGAGES—FORECLOSURE.
    A mortgage of railroad property to a trustee to secure certain bonds and interest coupons, providing that in case of demand and default of payment of interest for six months the trustee may enter upon the property, containing a similar provision as to advertisement and sale, and also an article stipulating that both said remedies were cumulative of foreclosure proceedings in the courts, which the trustee should institute at the direction of the bondholders "upon default being made as aforesaid," authorizes a bill to foreclose, although the default has not continued six months.

2. SAME—RECEIVERS—APPOINTMENT.
    That a railroad, heavily mortgaged, has made several defaults in the payment of interest, aggregating over $1,000,000; that the business is decreasing, with probability of further decrease from competition with new lines; that it is in need of repairs and improvements; that the bondholders are not in har-

mony; that a foreclosure is about to be decreed; and that no other way exists for applying the rents and profits of the road to its debts,—are sufficient reasons to justify the appointment of a receiver.

In Equity.    Bill for foreclosure and appointment of a receiver.

Bill by the Mercantile Trust Company of New York, trustee for certain bondholders secured by a mortgage on the property of the Missouri, Kansas & Texas Railway Company, against said company and the Missouri Pacific Railway Company, to foreclose the mortgage, and appoint a receiver.

*Alexander & Green, Thos. H. Hubbard, John J. McCook*, and *William N. Cromwell*, for complainant.

*Simon Sterne, Charles F. Beach, Jr., James O. Broadhead*, and *L. B. Wheat*, for defendants.

BREWER, J., (*orally.*)    In this case, I have had no opportunity to write out the conclusions to which I have come, nor, for that matter, to arrange my thoughts in any very orderly and systematic manner.    I should have preferred to take a little further time to put in better shape what I have to say; yet, aware of the fact that many of you gentlemen are from a distance, and are anxious to return home, I concluded to waive the matter of form and order, and state, in a crude way, my conclusions.    Nor are these conclusions reached simply from information developed in these few days.    This bill was presented to me more than three months ago.    I have had a copy of it in my possession since, and have taken frequent occasions to examine the stipulations of this mortgage.    Further than that, the newspapers have been full of many of the features of this controversy; and the property itself, being a property starting in my own state, and growing up there, is, neither in itself nor its history, a stranger.    So that many of the facts which have been presented and discussed are facts which were not new.

This bill was filed a few days after default in the payment of interest, June last.    And the first question—a vital question—is whether this suit was prematurely brought; for, being a suit to foreclose, and not one for the preservation of the property, if prematurely brought, it would finally have to be dismissed, and a receiver ought not to be appointed *ad interim.* The ground upon which the claim rests is the fact that this mortgage or deed of trust requires a six-months delay after the default before certain proceedings—and foreclosure, it is claimed, is one—are permissible. The second article provides for entry by the trustee, but by its terms such entry cannot be till six months after default and demand of payment.    The third article likewise authorizes sale by advertisement, and that is equally limited.    At the close of that article follows this paragraph:

"This provision is cumulative to the ordinary remedies by foreclosure in the courts; and the trustee herein, or its successor or successors in this trust, upon default being made as aforesaid, may, at its discretion, and upon the written request of the bondholders of a majority in value of said bonds then unpaid, shall," etc.

Now, the contention is that those words, "upon default being made as aforesaid," being in the last part of this article, by fair construction refer back to the entire provision in the first part in respect to default, and include both the happening and continuance of the default. The argument rests merely on the force of the last two words, "as aforesaid," and is forcibly put by counsel. That is the real question in the case, for, if this last paragraph in article 3 were omitted, the decision of the supreme court in the case of *Railroad Co.* v. *Fosdick*, 106 U. S. 47, 1 Sup. Ct. Rep. 10, would leave no question. In that case, as appears from the statement, there were in the mortgage stipulations providing for entry and sale by advertisement six months after default. The validity of those provisions was recognized by the supreme court; but it held that, notwithstanding this, if by other stipulations in the mortgage it was a security for the payment of interest as it semi-annually accrued, as well as of the principal, the trustee, or, on his failure to act, any bondholder, might, on the non-payment of interest, bring suit and foreclose. Turning to this mortgage, I find the same provision. It is given as security for the payment of the interest as well as of the principal. By article 2 possession is secured to the railroad company,—the mortgagor,—until default be made in the payment of principal or interest. Unquestionably the right of action at law on the coupon exists. Unquestionably, if articles 3 and 4 were omitted, the mere fact that this property was by the mortgage pledged as security for the payment of coupons would permit the coupon-holder to come into a court of equity and enforce that pledge.

It is insisted that these articles, not excluding the jurisdiction of courts of law, not debarring a party from his right of action upon the coupons, deprive him of a present right of action upon the mortgage by a suit in equity to enforce that pledge. Language requiring such construction should be clear. If the parties—and it is to be assumed that they who drafted this mortgage or deed of trust were competent for that business— contemplated not merely that no entry should be made, no sale under the power until the lapse of six months after default, but also that the coupon-holder, having his right of action at law on the coupons, should not have a right of action in equity, such purpose, it seems to me, would naturally have been expressed in clear and unmistakable language, and not in that of doubtful interpretation. In every other place that I have been able to find in this mortgage, where a right rests upon the continuance of the default, and that appears in articles prior and subsequent to this paragraph, the language is express: "In case default shall be made in payment of interest, and shall continue for six months." Now, if it was intended to limit the jurisdiction of a court of equity until after the lapse of six months from the time of the happening of the default, it seems to me that the draughtsman would have placed the stipulation therefor in a separate article, and would have made its meaning so plain that there would be no question. We all know in the preparation of instruments how common the expressions "said" or "as aforesaid" are used without any clear or definite intent. They are words which we use, not

thoughtlessly, but carelessly; and although they are used here, yet as it is also found that the continuance of the default is not mentioned, it seems to me it is giving to those words an enlarged and unnecessary force to hold that they broaden the expression "making default" into "making and continuing default," as expressed in the first part of the article. Nor is this a mere resting upon the language of the paragraph. It opens with the distinct announcement that these special provisions in respect to entry and sale under a power are cumulative to the ordinary remedies by foreclosure; contemplating, in its opening words, a proceeding in a court of equity in any case of default. Nor is it strange that there should be special limitations upon the two matters provided in articles 2 and 3, and none about proceedings in a court of equity. An entry is a speedy remedy; it runs to the *corpus* of the property; it takes instant hold of it, and takes it away from the mortgagor. The parties may well have contemplated that, if there was a temporary default, there should be no such speedy interference and summary seizure by the mortgagee. So a sale by advertisement—in this case an advertisement of eight weeks—is speedy and summary; and if, upon the happening of a temporary default, the trustee at the instance of a single coupon-holder should thus advertise and sell the property, it is obvious that great wrong might be done; and six months' delay is a very natural provision. But proceedings in a court of equity are not thus hasty. They are not within the control of any coupon-holder or any trustee. They stand advanced or delayed, as in the judgment of the chancellor the best interests of the property require. If it appears in any case that a coupon-holder, from improper motives, or from a simple greed for his money, is willing to wreck a large property, and comes into a court of equity upon the happening of a temporary default, it goes without saying that the chancellor holds his hands until it becomes apparent that the property as a whole cannot be saved to its owners. Inasmuch as these proceedings stand upon the discretion of a court of equity, it is not strange that the parties were willing to leave to the bondholders and coupon-holders an open door into such a court. They left an open door into a court at law, and there is at least equal chance, if not greater, that the freer motions of a court of equity will afford as full protection to the mortgagor. These considerations, perhaps not very clearly expressed, are the reasons which have led me to hold that this case is within the rule laid down in 106 U. S. 47, 1 Sup. Ct. Rep. 10, *supra*, and that this suit is not prematurely brought.

That only passes from one trouble to another. The right to foreclose does not carry with it the right to a receiver. There are many considerations that bear upon that question. Every case, of course, stands on its own merits. It is difficult to formulate any rule which, briefly stated, will control in all cases. It should appear that there is some danger to the property; that its protection, its preservation, the interests of the various holders, require possession by the court before a receiver should be appointed. It does not go as a matter of course; and yet it is not a matter that a court can refuse simply because it is an annoyance. If,

looking at the situation of the litigating parties, and of the property, with the prospects of the future, it should appear to a court that they would be benefited, that their interests would be subserved by the appointment of a receiver, why, no court—although a matter resting, as it is said, in its discretion—could refuse to make the appointment.

I shall not go over all the matters that have been discussed. I want to suggest some things that have impressed me. Of course, so far as the adequacy of this security, so far as the solvency of the corporation, is concerned, so far as the question whether this is a temporary embarrassment or permanent, these facts stand out confessed, indisputable at least. It has ceased to pay interest on its mortgages; one, two, three, and four have defaulted. The amount of that interest runs considerably over a million; and the payment of interest on the large mortgage comes due in two months. The business of this year from the 1st of June to the 1st of September, as shown by the statistics, is decreasing; from the 1st of September to the 14th there was a slight increase. The road is not along the main highway of travel eastward and westward. It is one running north and south, along which business to-day is, as we all in the west know, comparatively in its inception. It crosses for two or three hundred miles a territory which is occupied by Indians, and furnishes little business. It has been for years the only road that traversed that territory. Within the last year or two, two more roads have crossed, and a third is seeking to cross. Competition between these roads traversing that territory, and bringing Texas and its commerce into relations with Kansas, Missouri, and the north, as a matter of necessity, it seems to me, must tend against the increase of earnings.

The report of the committee—a committee appointed by the company—tends to show that the payment of interest which has been made prior to this year, has been largely at the expense of the proper repairs and improvement of the road. I do not mean to say that all this is absolutely conclusive on the question, but these are matters which have forced themselves upon my mind. While it is true that—the road paying no interest since the 1st of June—the revenues have diminished by four or five hundred thousand, the amount which is due as claimed to the Missouri Pacific for advancements, yet the earnings must increase largely before these back interests can be met, to say nothing of future interests speedily maturing. That a road thus situated, some 1,600 miles in length, is burdened with a mortgage of $28,000 a mile, carries with it, to my mind, very strong evidence that there is no reasonable probability of its ever being kept in proper condition when paying the interest on such a debt. The only way in which any mortgagee can get possession of the rents and profits is through a receiver. The law of Kansas forbids any other remedy upon a mortgage than a foreclosure in the court. No possession could be had under article 2. No sale could be made under the power attempted to be given in article 3. The sole remedy is by foreclosure. Unless a receiver is appointed, the rents and profits pass into the possession of the mortgagor, to be expended by it according.to its best judgment. That is affirmed by the three cases of *Railroad Co.*

v. *Cowdrey*, 11 Wall. 463; *Gillman* v. *Telegraph Co.*, 91 U. S. 603; and *Dow* v. *Railway Co.*, 124 U. S. 652, 8 Sup. Ct. Rep. 673. Not merely that; suppose this foreclosure proceeding should pass to a decree, and the defendant appeal, its bond on appeal would be no protection to the mortgagee in respect to the rents and profits. That is settled in the case of *Kountze* v. *Hotel Co.*, 107 U. S. 378, 2 Sup. Ct. Rep. 911. So that this litigation might proceed and continue for a long time in this and in the supreme court, without ever giving the mortgagee a hold upon the profits, unless a receiver is appointed. This mortgage is a second mortgage on a large part of the road. As such mortgagee it has, more than any other party, an interest in reaching after and securing those rents and profits. The first mortgagee, having a limited amount upon the part of the road upon which its mortgage rests, may feel safe; for his principal and interest must be paid before the second mortgagee can come in. So that the complainant has a special interest in reaching for, and as soon as possible obtaining possession of, the surplus earnings. More than that, it is perfectly obvious that the real owners of this property are not in harmony. The stock controls the road, but with $45,000,000 of bonded indebtedness—$28,000 a mile—on the road, the real owners are the bondholders, and that they are not agreed in respect to what shall be done with this property is, I think, confessed. For years the property was in the management of a certain interest. That interest was removed last spring from the control. It was not removed so long as the road was apparently prosperous, and paying its coupons. When adversity threatened it, as was natural, those who held interests in the road were not satisfied with the management, and sought control. If these gentlemen now in control could make it a promptly paying road within a reasonable time, why, it might be expected, according to the laws of human nature, that they would remain in control; but we all know how, when one fails and continues to fail, all who are interested are prone to lay the responsibility upon him, and to seek a change. And there is no certainty that another year different interests might not combine, and so the road be subject to different control. At any rate, it is very evident that there is no harmony—no unity of purpose—between those who are the real owners. Now, if it were a partnership, and it was apparent to a court that the partners had got into a quarrel, the very fact of their quarrel would be a strong reason why it should take possession of the property. Of course that consideration has not so much force in respect to a corporation, but it strengthens other considerations. Those are the principal reasons that have operated on my mind,—the default in interest, the fact that the rents and profits can only be appropriated in this way, the decreasing revenues, the recent construction of parallel roads, the fact that it passes through such a portion of territory so unprofitable, the condition of the road as developed by this report of the committee, and the conflict between various parties having real and substantial interests. Much as I should be glad to be free from the annoyance of a receivership,—and I know something about it,—it seems to me I should be delinquent if I refused this application. There are some minor mat-

ters that I might refer to, yet, perhaps, they would not strengthen anything I have said.

There is one matter, however, I must notice,—the suggestion of the Missouri Pacific that it could defeat this application, and that it was here in the attitude of a party to consent upon the condition that the balance due it was properly protected, and that no order should be made in reference to the possession by the receiver of the International & Great Northern Railroad or its stock. If I understood the situation to be that this application depended on the consent of the lessee, the Missouri Pacific, and its consent was tendered upon any such condition as that, there would be no receiver appointed. The rights of the lessee, as I look upon these two instruments, are subordinate to the rights of the mortgagee, and it is the mortgagee whose application is sustained, and all parties having claims of any kind must depend upon the inherent equity of their claims. So far as the stock in the International & Great Northern is concerned, as well as some other assets, they are, as stated, now under pledge, and in the possession of this complainant; perhaps, also, attached by certain garnishment proceedings. I think the interests of the mortgagor require that there should go an order upon the complainant not to part with that possession, except in obedience, of course, to the process of the courts in New York, until the ultimate rights of the parties are determined. As to the possession of the International & Great Northern, I doubt whether it is within the province of this court to determine that question. It is a separate road, whose stock, I believe, in part has become the property of the Missouri, Kansas & Texas corporation; but it is wholly situated in another circuit, and certainly at present I am not prepared to say that this court would have a right to determine whether a receiver of the Missouri, Kansas & Texas should take possession of that separate road. It may be that is a question which will have to be determined by the judge of that circuit. At any rate, I should not at present, without further consideration, perhaps consultation with Judge PARDEE, feel like making any order in respect to it. It is a matter in which I shall be glad to hear counsel hereafter upon, and perhaps try and arrange with Judge PARDEE jointly to hear them as soon as practical. That, I think, is about all I have to say in reference to this matter, except as to the receiver. If parties agree upon a receiver, of course I shall appoint whoever you agree upon. If not, I will hear any suggestions from any of the parties in interest, and reasons for or against any person to be named by one side or the other.