## THE AGNES I. GRACE.

### PROPELLER TOW-BOAT CO. *v.* THE AGNES I. GRACE.

*(District Court, S. D. Georgia, E. D. January 27, 1892.)*

1. SALVAGE—COMPENSATION—EVIDENCE.
     A schooner drawing ten feet of water was blown out of her course, and carried over shoals where, for a distance of two miles and more, the water at low tide was from one to three feet deep, and finally went aground in a quicksand, into which she sunk, in a short time, the distance of three feet. From contact with her anchor a hole had been knocked in her bottom, admitting a volume of water into the vessel, which rose and fell with the tide. The water was pumped out of her hold, and she was pulled off the shoal by libelant's steam-tugs, at great risk to the tugs. Cargo to the value of $7,000 was saved, and the vessel was afterwards sold for the sum of $5,030. *Held*, that the sum of $5,000 was not an excessive allowance for salvage.

2. SAME—AGREEMENT OF MASTER.
     The agreement of the master to pay $5,000 salvage, while not binding on the court when deliberately made, will be regarded as a valuable indication of what should be the true amount of the recovery.

In Admiralty. Libel by the Propeller Tow-Boat Company against the schooner Agnes I. Grace for salvage.

*Lester & Ravenel* and *Geo. A. Mercer & Son,* for libelant.
*Chas. N. West,* for respondent.

SPEER, District Judge. It appears in the evidence submitted to the court that on the 26th of April, 1891, the schooner Agnes I. Grace, bound for Port Royal, S. C., loaded with a cargo of jute bagging, put into Tybee roads under a stress of weather. The wind was strong, and from the East N. E. According to the testimony of the log-book, the schooner, after she crossed the bar, was running by the range lights on Dafuskie island, near Bloody point, and proceeded in a northerly direction, a little west by north, until she came up on the sands 3¼ nautical miles, by the scale, from the channel or anchorage used by vessels seeking shelter. It appears from the chart that the schooner (coming in at high tide) passed over shoals where, at low water, the depth is from one to three feet for more than two miles, by the scale; and the point where she finally went hard aground was a little to the north-eastward of a spot marked on the chart as "dry." It is in evidence on all hands that this left the vessel in an exceedingly perilous condition. She was exposed to the full force of the sea and the winds, should the winds from the north-east, east, or south-east prevail; and, indeed, the evidence is that she was as much exposed to the winds from those directions as if she had been entirely outside of the bar, and on a shoal, exposed to the full force of the Atlantic rollers. Not only was this true, but the nature of the ground on which she went ashore was exceedingly treacherous and dangerous. Sands of this character are described by Judge HUGHES in his opinion in the case of *The Sandringham,* 10 Fed. Rep. 562, in the language following:

"The fact is that there, and all along the coast for several hundred miles, the sand is a fine, movable substance, which, when a heavy body is resting upon it, retreats from under it by the action of the currents of the ocean, which there constantly prevail, leaving a bed into which the body sinks deeper and deeper, the longer it remains in its position. There is no possibility of any substance which, in specific gravity, is too heavy to float upon the surface of the water, being lifted out of its bed in this sand, and floated upon the shore. All the vessels that are beached upon the sands of this long coast invariably continue to sink, deeper and deeper, until they disappear from sight under the sea into the sand. The fate of the United States steam-ship Huron wrecked off Kitty Hawk, November 27, 1876, was a notable historical exemplification of this part of the coast."

The evidence of the witnesses—many of them competent and experienced observers—relative to similar instances of stranded vessels upon the sands contiguous to or nearly contiguous to those where the Grace went ashore, confirms the statement of Judge HUGHES, just read, and the facts of this particular case also bear it out. The undisputed testimony of one of the witnesses is that at one period of his observation of the vessel the crew were overboard, with their trousers rolled up, wading around in the water, about knee-deep. The testimony of the master of the stranded vessel is substantially to the same effect. The vessel drew 10 feet. She was then sunk into the sand, in the time in which

she had remained stranded, from 2½ to 3 feet. Not only is this true, but it is in evidence that from some cause, and most likely by contact with her own anchor, when it was thrown overboard, a hole was knocked in her bottom, on the starboard side, at the turn of the bilge. The testimony of the ship-carpenter that repaired her proves the existence of this alarming injury, and through this hole a large volume of water was speedily admitted into the hold of the vessel; and, according to the log-book of the vessel itself, the water in the vessel rose and fell with the rise and fall of the tide. In this condition, therefore, the peril of the vessel was exceedingly great, and it is true that there were no means of succor at hand, save that offered by the vessels of the libelant, the Propeller Tow-Boat Company, which services were promptly tendered, and were performed with all the skill and energy the circumstances of the case permitted. Finally, it appears in evidence, through the efforts of the Propeller Tow-Boat Company, that the schooner was dragged off after her cargo was lightered, and after the immense volume of water had been pumped out by their powerful steam-pump, and was afterwards repaired at an expense of $1,200. A large portion of the cargo, amounting in value to $7,000, was also saved. The schooner was sold at the price of $5,030,—manifestly, from the evidence, only a moiety of her value; and it is to recover salvage from these values that this libel is brought. It is also in evidence that, pending the efforts on the part of the libelant, the Propeller Tow-Boat Company, to relieve this vessel, a definite contract was entered into between the master of the vessel and Capt. Avery, who commanded one of the tow-boats, and conducted the operations, by which contract the master of the vessel engaged to pay the Propeller Tow-Boat Company the sum of $5,000 as salvage, and this contract is put in evidence, and relied upon by the libelant as a circumstance of great value in the evidence, as indicating the amount of salvage which should be allowed by the court. It is true, as is insisted by the respondent's counsel, that a contract of this character is not binding upon the court, and that in all cases of salvage it is competent for the court to adjudge and assess the amount of the recovery in accordance with the equities of the case; and, if it should appear that a contract of this character was an inequitable one, the court would, of course, disregard it. But whenever a contract has been entered into after due deliberation by the parties, and has not been shown to be in any respect an inequitable one, it is exceedingly valuable as evidence to enable the court to arrive at a just determination. The court regards this contract as evidence in that light, and not as a conclusive contract; but it is a most significant and valuable indication of what should be the true amount of the recovery. And, considering all the facts of the case, the court is of the opinion that the contract stipulates but a moderate charge for the services rendered in this case, and it is perhaps true that, if a larger demand had been made, a larger allowance would have been permitted by the court.

Numerous cases have been cited by the respondent's counsel where a smaller sum has been found as salvage services by various courts, upon

various statements of facts presented, respectively, in each case; but in no case thus cited was there a vessel imbedded 2½ to 3 feet in the sand, 3½ nautical miles from its proper channel or anchorage, exposed to all the vicissitudes of the weather and the ocean, with no protection in the nature of a harbor from the wind and the waves, with a hole knocked in her bottom, and with the tide flowing and ebbing in the hold of the vessel as it flowed and ebbed in the ocean around her. In this condition of affairs, the court is of the opinion that the peril of the vessel was extreme; that the chances of success in its rescue were exceedingly slight, and this is plain from the testimony of all the experienced pilots who were disinterested witnesses in this case, and by one other witness, the harbor-master of the city of Savannah, himself a pilot, who was offered on the part of the respondent. It is also true, in the opinion of the court, that the skill exerted and the labor expended were great; that the libelant labored for several days when making this rescue; and, after the rescue was made, it was only by the presence of its powerful steam-pump, continually exerted, that they were enabled to keep the vessel afloat; and only with the presence of that steam-pump,—a wrecking pump,—worked by the assistance of the steam of a tug, and at imminent hazard to the tug, was it possible so to relieve the vessel of the water in her hold as to enable her to float. The testimony of Willink, the ship-carpenter, who repaired her, is that she barely escaped sinking in the river at his yard, when the pumps were stopped for a short time. The promptness, skill, and energy displayed in saving the property were entirely adequate, and, in our opinion, it is clear the Grace could not have been floated before she was. The value of the property employed in rendering the services amounted to many thousand dollars. There were two valuable tugs, worth in the aggregate from $60,000 to $70,000; two lighters, of considerable value; and a small additional tug, which generally earned $25 per day. The risk incurred by the salvors in securing the property from imminent peril was great, and experienced pilots cautioned the master of the tugs not to undertake it. It is true that, if the tugs had been managed with less skill, without mutual assistance to each other, and without the judgment shown by those directing the work, they would, not improbably, have shared the fate which was then imminent to the Grace herself. The value of the property saved was considerable, and has already been described. On the whole, therefore, the court finds for the libelant the whole amount of salvage claimed in the libel, together with the sum of $210, which has been expended for pumping at the ship-yard, and about which there is no dispute. We also find for the intervener, Joseph A. Roberts, the amount proven as due him upon his intervention. The amount of the decree will be apportioned between the proceeds of the vessel in the registry of the court, and the value of the cargo which has been rescued, for which stipulation is given. The pleadings, it is conceded on both sides, will not permit the application of the doctrine of general average between the owners of the cargo. If, however, application should be made by the owners of the cargo to apportion such portion of the decree as may be assessed

against the cargo between the several owners thereof, the court will, at the proper time, consider that application.    The decree will be entered in accordance with the finding.