## THE EDITH L. ALLEN.

### (District Court, S. D. New York. March 26, 1903.)

1. SALVAGE—SAVING OF STRANDED SCHOONER—AMOUNT OF COMPENSATION.

The schooner Edith L. Allen, laden with lumber, stranded off the coast of New Jersey near evening in February. The following morning a tug with a surf boat having a wrecking crew came to her assistance, and after three days' work, attended with considerable danger, and after jettisoning a portion of her deck cargo, she was floated, and towed to New York. She was considerably injured, and leaked to such an extent that her pumps were unable to keep the water down, and she had eight feet of water in her when floated. She was also in danger of total destruction in case of an east wind. The tug was of the value of $50,000, and was damaged to the extent of $1,700 by striking bottom while attempting to pull the schooner off. The schooner was worth about $25,000 when she went ashore, and was damaged to the extent of $3,500. Her saved cargo was worth $8,000, and her freight $3,300. *Held*, that the salvors were entitled to an award of $6,500, besides the cost of repairing the tug.

In Admiralty. Suit to recover for salvage services.

Robinson, Biddle & Ward, for libellants.

Benedict & Benedict, for claimant.

ADAMS, District Judge. This is an action to recover salvage for services rendered by the libellants to the schooner Edith L. Allen, her freight and her cargo of lumber. She was laden with her cargo at St. Simons, Georgia, and bound to New York. As she was sailing up the New Jersey coast, on Sunday, the 2nd day of February, 1902, she was struck by a strong squall from the northwest, which blew her head sails to pieces. In consequence thereof, she came up rapidly into the wind and before control could be regained of her navigation, she ran ashore on the outer Brigantine Shoal, about three and a half miles from the beach. The stranding occurred about 5:30 o'clock p. m. Within a distance of about two miles from the place where the schooner struck, there was a stranded steamer, called the Claverdale, which went ashore Sunday morning. Near her, in the expectation of rendering salvage services, was the tug Sommers N. Smith, belonging to the libellant Frank L. Neal, Trustee, which had reached the scene about 2:30 o'clock in the afternoon. The Smith had picked up on the way to the Claverdale, a surf boat belonging to the other libellant, which was also engaged in the wrecking business, with a crew of 14 men, which had been in tow of another tug bound to the assistance of the Claverdale, from Lewes, Delaware. This tug had broken down and been obliged to return. When the Smith arrived near the Claverdale, she could not approach her then owing to a high sea and the condition of the tide, but the life boat reached her with the wrecking crew, which went aboard the steamer and hauled the boat up to get her out of danger. The crew were still aboard of the Claverdale when the schooner stranded. It appears that other assistance had been arranged for to relieve the steamer, and the Smith and the wrecking

¶ 1. Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.

crew found no employment on her, though there was a possibility of their being required in case of the non-arrival or the insufficiency of the expected vessels, which subsequently did arrive, however, and sufficed for the Claverdale's needs.

Previous to the stranding of the schooner, the wind had been easterly, causing a turbulent sea, which gradually subsided under the influence of the land breeze, but the weather remained intensely cold, and the spray from the sea froze as it fell upon the vessels, with the effect of icing up the rigging and sails of the schooner rendering her practically helpless, without outside assistance.

The plight of the schooner was seen by the Smith and wrecking crew as she approached the beach, and the distress signals which she subsequently exhibited were also observed, but no attempt was made to render her any assistance until the next day, when it became apparent, from the arrival of the expected aid, that the Claverdale would not afford salvage employment to the tug and wrecking boat, and they turned their attention to the schooner. A strong gale from the land then prevailed but they were able to reach her, by the tug making a lee for the boat. The crew of the boat went on board, while the tug anchored near at hand. This was on the morning of Monday, the 3rd. The schooner was then hard ashore, in about 17 or 18 feet of water, on a lump of sand, and considerably injured from the pounding she had received, so that she had several feet of water in her, and was unable to overcome the effect of the leakage with the use of her own pumps.

There can be little doubt that in the absence of adequate assistance, the schooner was in great danger of becoming a total loss, from a change of the wind to the eastward, which was impending and in fact occurred before the schooner was floated. In view of the danger, the tug and wrecking boat were employed by the schooner as salvors and immediately began endeavoring to save her. A hawser, belonging to the wrecking boat, was run from the tug to the mainmast of the schooner. It was then a little after low water and useless to pull until towards the height of the tide, which was at about 4 o'clock p. m. The tug commenced to pull at about 3 o'clock and pulled several hours on the schooner from astern but without much, if any, effect. She pulled again at the next tide, Tuesday, the 4th for several hours, also without apparent effect. In the meantime, the wreckers suggested to the master of the schooner that the deck load should be thrown off to lighten her but the master would not consent that it should be done, in the absence of the owner, who had been notified of the disaster through the New York Maritime Exchange and was expected to arrive soon. The owner reached the schooner at about 5:30 o'clock A. M. Tuesday, by means of one of the boats of the Life Saving Station, which was near at hand, and immediately gave direction that the after part of the deck load, some 15,000 or 20,000 feet, should be thrown over, which was done, principally by the wreckers. The high wind which had prevailed from the land during all this time, with the effect of blowing the water off shore, ceased to some extent during Tuesday, with a tendency to shift to the eastward, which permitted the inflow of the tide to resume its normal effect upon the depth of the

water on the beach. The tug commenced to pull again in the after-noon of Tuesday and aided by the increase of the depth of the water, succeeded in getting the schooner free before high water. When float-ed, she was found to have about eight feet of water in her but the wreckers, assisted to some extent by the men belonging to the schoon-er, were able, with the use of her own pumps, to keep the water down, and, aided by her bouyant cargo, she was found to be in a condition to be taken to her destination. The Smith accordingly towed her to New York and she arrived and was docked there, with about five feet of water in her, and a slight increase of draft, on Wednesday, the 5th.

The sound value of the schooner, when she went ashore, was about $25,000. She was injured by the stranding to the extent of about $3,500. The saved cargo was worth $8,000, and the freight valued at $3,300.

The Smith was a powerful and well fitted steel wrecking vessel, about 120 feet long, worth about $50,000. The service was attended with serious danger, as particularly appears from the fact that the tug struck bottom, while rendering it, causing a damage, which cost $1,700 to repair.

It is claimed on behalf of the schooner that there were three ele-ments which contributed to her release: (1) the services of the Smith; (2) the throwing off of the deck load, and (3) the inward rush of the tide, which enabled the Smith to drag her off the shoal. It is contended that the wreckers should not be compensated for the last two. With respect to the deck load, as a matter of fact, the suggestion of the throwing it off, first came from the wreckers and they actually handled the lumber. It was not a matter of great importance, however, as it only made a difference of a few inches in the draft of the schooner, and it appears that she would probably have come off at the height of the tide, if not before, even if it had remained on board. The change in the wind, which brought a normal state of the tide was, of course, an extremely important feature of the proceedings and it may be that without it, the salvage would not have been accomplished, but it does not follow, as claimed, that the salvors are not to be fully compen-sated for the success of their efforts because they were aided by nature. It appears here, that, in all probability, without the opportune inter-vention of the salvors, the change of wind, with the consequent in-crease of depth of water, though it might have caused the schooner to float temporarily, would eventually have driven her higher upon the beach and led to her total loss.

I conclude that a salvage award of $6,500 should be made, to be di-vided between the schooner, the cargo and the freight, in proportion to their values. I also allow the owner of the tug the cost of her repairs. I have not been asked to make separate salvage awards to the libellants. If any difficulty should occur in the distribution of the amount allowed, further proceedings may be had.

Decree accordingly.