## THE EDITH L. ALLEN.

### (Circuit Court of Appeals, Second Circuit. March 11, 1904.)

#### No. 132.

1. SALVAGE—RESCUE OF STRANDED SCHOONER—REDUCTION OF AWARD.

A salvage award of $6,500 for the rescue of a schooner valued, as saved, with her cargo and freight, at $32,800, which was stranded on the coast of New Jersey, reduced on appeal to $4,500; it appearing to have been increased to some extent by a misapprehension by the trial judge of the facts shown by the evidence as to the peril of the stranded vessel.

Appeal from the District Court of the United States for the Southern District of New York.

For opinion below, see 122 Fed. 729.

This cause comes here upon appeal from a decree of the district court, Southern District of New York, awarding to Neal, as owner of the tug Somers N. Smith, and to the American Salvage Company, which had a crew on board said tug, the sum of $6,500 salvage for pulling the schooner Edith L. Allen off the eastern edge of Brigantine Shoal, on the coast of New Jersey, and towing her to the port of New York. The decree further awarded to Neal the sum of $1,700 for damages alleged to have been sustained by the tug during the salvage operation. The appellant contends that the court erred in awarding anything for damages to the tug, and that the amount of salvage awarded is excessive. It is not disputed that salvage service was rendered. The value of the schooner, as saved, her cargo and freight, was $32,800. The

¶ 1. Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.

value of the tug, specially equipped with the best appliances for wrecking, was $50,000.

Edward G. Benedict, for appellant.

Henry G. Ward, for appellees.

Before WALLACE, LACOMBE, and COXE, Circuit Judges.

LACOMBE, Circuit Judge. The opinion of the District Court will be found reported in 122 Fed. 729. It sets forth the facts so fully that it is not necessary to undertake to restate them here. It will be understood that the conclusions of this court are based thereon, with such modifications only as are hereinafter set forth.

While hauling on the schooner, February 3, 1902, the tug struck bottom, certainly twice, possibly three times. These blows were very severe ones. The engineer testified that he was at the throttle, handling the engines, at the time, and that the blow came very near throwing him down off his feet, and made the tools rattle in the fireroom, and also shook the coal bunkers, boilers, and pipes in the engine room. There were big swells running at the time, and she struck twice, at least, between swells. So they paid out the hawser, and got into deeper water. The day before, while near another stranded vessel, and before the salvage service of the Allen was undertaken, the tug also touched bottom, but that was a very slight contact—she "just nudged the bottom"—whereas, when she struck while hauling on the Allen, "it was a harder strike. She came down on something, and it jarred her all over." The tug is a steel boat, with a double bottom; the spaces between the floors being filled up with cement and pig iron, making a very solid structure. No leak developed after the blows testified to, and no survey of her bottom was made till she was put on dry dock, two months later, for her usual spring overhauling. It was then discovered that her port side was damaged about amidships under the boilers. some of the garboard streak plates were bent, and had to be taken off and renewed, and the vertical floor under the forward fireroom bulkhead was bent, buckled, and distorted so that several frames had to be straightened. No holes were punched through the plates, but they were fractured on the inside and at the rivet holes. The mechanic who made the repairs had attended to the tug at her overhauling the spring before, and testified that these injuries did not then exist. Her master testified that he had been by the tug the whole of the time since the prior overhauling—"every day, never been off her two hours"— and that she never struck bottom during that period, except on the occasions above set forth. Upon this uncontradicted evidence, the district judge was warranted in finding that the injuries to the tug's bottom were sustained during the salvage service, and his award therefor was proper.

The amount awarded for salvage rests usually in the discretion of the court awarding it. Nevertheless, in The Bay of Naples, 48 Fed. 739, 1 C. C. A. 81, we held that:

"Appellate courts will look to see if that discretion has been exercised by the court of first instance in the spirit of those decisions which higher tribunals have recognized and enforced, and will readjust the amount if the decree below does not follow in the path of authorty, even though no principle has been violated or mistake made."

And a readjustment will more readily be made if the award below appears to have been enlarged through some misapprehension of the facts.

It is apparent that the salvors have been awarded a very high percentage of the amount salved. The appellant has submitted a list of all salvage cases found in the Federal Reporter down to date (say volume 124), where wooden vessels have been rescued from a stranded situation on the Atlantic Coast. They are given in a note, as a convenient supplement to the list given in the note to The Lamington, 86 Fed. 675, 30 C. C. A. 271. In the case at bar an important circumstance is the condition of the tide at stranding and until rescue. The schooner stranded on the eastern edge of the shoal during a strong squall from the northwest (offshore), which blew her headsails to pieces, so that she came up to the wind; and, before they could get her off, she was ashore. This was on Sunday, February 2d, at about 5:30 p. m. The wind had been easterly, but by 11 a. m. it had shifted to the west, and blew from the west and northwest until the stranding, increasing in violence. It had been blowing hard offshore for certainly four hours before the "living gale" in which the master of the schooner says she went ashore, with the natural result of somewhat flattening the sea and holding back the water. There is conflict between the weather records at Atlantic City, six miles distant, and the witnesses from the life-saving stations near Brigantine Shoal; but it may fairly be assumed, as libelants contend, that during the night of Sunday, and during Monday and Monday night until near midnight, there was a heavy offshore blow. The heaviness of the blow was not an especial peril to the schooner, since she was was not far enough offshore for the wind to make much of a sea; and, had she been blown off, she would not have sunk, because her leaks, as the event showed, were not beyond the control of the pumps. This strong offshore wind, however, prevented the natural rise of the tide. In consequence the tug strove in vain to haul her off—for two hours at high tide Monday afternoon, and again for a like time at the next high tide, early Tuesday morning. Thereafter, however, there came a change in the wind, which ceased to operate to hold back the water, and in consequence the next tide came in with an unusual rush; and on the third pull, which began about 1 p. m. Tuesday, February 4th, the schooner came off the shoal about 2:30 p. m., without any difficulty, and when the tide was only half high. If this change in the wind had been one from offshore to onshore, the schooner's position would have been serious, because, being without headsails and heavily iced, as the water lifted her the wind would have driven her aground higher up on the shoal. A change, however, only from a heavy to a light breeze, would not tend to produce such result, and might allow her to get afloat by the use of her own anchor and capstan. The evidence is uncontradicted that this was the only change. The wind fell to less than six miles an hour, and, although for a brief space it backed around to northeast, it remained westerly not only until the schooner was pulled off, but during all the rest of the week. It would seem, however, that the district judge was under the impression that the wind changed in direction as well as in velocity. He says:

"There can be little doubt that * * * the schooner was in great danger of becoming a total loss, from a change of the wind to the eastward, which

was impending, and in fact occurred before the schooner was floated." And again: "The change in the wind, which brought a normal state of the tide, was, of course, an extremely important feature in the proceeding. * * * It appears here that, in all probability, without the opportune intervention of the salvors, the change of wind, with the consequent increase of depth of water, though it might have caused the schooner to float temporarily, would eventually have driven her higher up on the beach, and led to her total loss."

Manifestly this understanding of situation operated to increase the award beyond what would otherwise have been made, and we think the salvage should be reduced from $6,500 to $4,500.

The decree is reversed, with costs of this court to appellant, and cause remanded to the District Court, with instructions to decree in accordance with this opinion; costs of district court to libelants.

NOTE. Salvage cases cited on argument, being all those in the first 124 volumes of Federal Reporter where a wooden vessel has been rescued from a stranded situation on the Atlantic Coast:

| | |
|---|---|
| Mary E. Long (D. C.) 7 Fed. 364 | 4 % |
| Maggie Ellen (D. C.) 19 Fed. 221 | 5 % |
| Andrew Adams (D. C.) 36 Fed. 205 | 33⅓ % |
| Nellie Floyd (D. C.) 36 Fed. 221 | 6½ % |
| The Eleanor (D. C.) 42 Fed. 543 | 5 % |
| Thos. B. Garland (D. C.) 83 Fed. 1018 | 6¼ % |
| Agnes I. Grace (D. C.) 49 Fed. 662 | 42 % |
| The Penobscot (D. C.) 103 Fed. 205 | .9 % |
| Thos. L. James (D. C.) 115 Fed. 566 | 25 % |