## THE JOB H. JACKSON.

(District Court, E. D. North Carolina. May 23, 1908.)

**1. SALVAGE—NATURE OF AWARD.**

The underlying idea in all salvage allowance is a reward or bounty for services in saving property from impending danger or imminent peril of loss to the owner by one on whom no legal obligation rests to perform such service.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Salvage, § 1.

For other definitions, see Words and Phrases, vol. 7, pp. 6312, 6315; vol. 8, p. 7794.]

**2. SAME—COMPENSATION—SALVING OF DERELICT.**

The Schooner Jackson, loaded with lumber, bound from Savannah to New York, was wrecked in a storm, and became a derelict off Frying Pan Shoals in the track of coastwise commerce. Some days afterward the steamship Merrimac, with passengers and cargo, from Philadelphia, went out of her course, picked up the Jackson and towed her to an anchorage near the Cape Fear bar and signaled for tugs. The next morning a fishing steamer towed the Jackson inside the bar, and a tug then towed her to Wilmington. The Merrimac was worth from $300,000 to $400,000, and the service was attended with some danger from the Shoals. The Jackson before the wreck was worth $50,000. After being salved she was appraised at $2,250, and her cargo at $5,360. She was afterwards repaired. *Held*, that the service of the Merrimac was a salvage service, and that she was entitled to an award of $2,500, two-fifths to her officers and crew; that the tugs rendered only towage service, and were entitled to its value as such only.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Salvage, §§ 7–11.

Awards in federal courts, see note to The Lamington, 30 C. C. A. 280.]

In Admiralty. Suit for salvage.

Geo. Rountree, for libelants.
E. K. Bryan, for tugs.
Jno. D. Bellamy, for respondents.

PURNELL, District Judge. On or about the 20th of September, 1906, the schooner Job H. Jackson loaded with a cargo of lumber, bound from Savannah, Ga., to New York and Philadelphia, was a derelict, having been dismasted and water-logged by a storm or hurricane and abandoned at sea. The schooner was drifting on the outer edge of Frying Pan Shoals, in the track of vessels engaged in commerce north and south on the Atlantic coast, and a menace to commerce. She was reported as a derelict and as having lost three of her crew by two United States cruisers, which report was published in the publications relied on by those interested in South Atlantic commerce. In this condition the said Job H. Jackson was sighted by the master of the steamship Merrimac, a freight and passenger steamship plying on a regular schedule between Philadelphia, Pa., and Savannah, Ga. The steamship Merrimac left Baltimore with a cargo and 75 passengers on September 18, 1906, and upon sighting the derelict on her starboard bow changed her course, against the protest of all the crew,

except the second officer, and passengers, got a hawser attached to the Jackson, and towed the derelict schooner to a point about one mile inside the bell buoy, a mile or so from Ball Head light, near the Cape Fear bar, where she was anchored in a bike in about five fathoms of water. Unless a storm arose during the night, this was safe anchorage, and there was no storm that night. The sea was calm. There was little or no wind. The wind freshened after night, but the sea at no time became rough or dangerous. The Jackson was a three-masted schooner. All masts, except the mainmast were lying across or on the deck, with sails and much other wreckage; but the schooner, though having shipped much water from the wash of the sea, was not leaking to any extent. The Job H. Jackson intact was worth $50,000, as testified to by a shipowner. The appraisers appointed for this purpose, men of the highest character, valued the ship at $2,250, and the cargo of lumber at $10 per thousand; there being according to the manifest 536,000 feet in the cargo. The Job H. Jackson has since been repaired, her name changed, and is now in commerce—"sailing the seas." The steamship Merrimac had also been recently overhauled and is valued at $300,000 or $400,000.

After the schooner Jackson was anchored as before stated, the Merrimac, in attempting to rig a bridle on the schooner and on her own the steamship's stern, fearing the hawser would become foul in her propeller, stopped her engines, and dropped her anchor. A signal for a tug was then hoisted. A gasoline launch first came alongside; but this craft does not figure in the controversy. No claim is made for this launch, and no service was rendered by it upon which to base a claim. Afterwards the Sanders, a fishing steamer returning from sea, where she had been pursuing her usual business of fishing, "not chartered for towing," but engaged in fat back or meherrin fishing, and the Blanche, a tug doing a regular towing business on the Cape Fear river, and outside the bar at Ft. Caswell and Ball Head, came alongside the Merrimac; but, after some chaffering about towing the Jackson into port, decided not to attempt to tow her inside the bar that night, on account of the darkness and a shortness in the supply of coal. The tugs returned to Southport for the night. The second officer of the Merrimac was on the schooner, and remained aboard in charge of her until she was turned over to the underwriters at Wilmington some days later. The next morning the Sanders returned to the scene and towed the Jackson across the bar. She was anchored by the second officer of the Merrimac off Battery Island inside the harbor. The Sanders then proceeded up the river 10 miles to the factory for coal; the second officer of the Merrimac being aboard. On the return down the river those on the Sanders met the Blanche with the Jackson in tow. Both these tugs filed an intervening libel for salvage, and it is strenuously insisted they are entitled to an allowance in this behalf. It is admitted the Merrimac is entitled to salvage; the only question being as to what would be a fair and equitable allowance. The main controversy is: Were the services rendered by the tug Blanche and the fishing steamer Sanders salvage services or a mere towage?

What is salvage? Every one will speak glibly of salvage, and nearly every one thinks he knows what it means. Hughes, in his work on Admiralty, thus defines it:

"Salvage is the reward allowed for a service rendered to marine property at risk or in distress by those under no legal obligation to render it, which results in benefit to the property if eventually saved."

Tested by the decisions, this definition will be found defective in many particulars. But the decisions are in many particulars contradictory, even those cited as authority for this definition. The definition given in Flanders on Maritime Law is more full and supported by at least higher authority. Says Flanders:

"Salvage is founded on the equity of remunerating private and individual services performed in saving in whole or in part a ship or its cargo from impending peril, or recovering them after actual loss. It is a compensation for actual services rendered to the property charged with it, and is allowed for meritorious conduct of the salvor, and in consideration of a benefit conferred upon the person whose property he has saved. A claim for salvage rests on the principle that, unless the property be in fact saved by those who claim the compensation, it cannot be allowed, however benevolent their intention and however heroic their conduct."

As authority for this definition is cited The Amelia, 1 Cranch, 1, 2 L. Ed. 15; The Alberta, 9 Cranch, 369, 3 L. Ed. 758; Clarke v. Dodge Healy, 4 Wash. C. C. 651, Fed. Cas. No. 2,849; The Henry Ewbank, 1 Sumn. 417, Fed. Cas. No. 6,376. So Bouvier's Law Dictionary thus defines salvage:

"In maritime law: A compensation given by the maritime law for service rendered in saving property or rescuing it from impending peril on the sea or wrecked on the coast of the sea, or in the United States on a public navigable river or lake where interstate or foreign commerce is carried on."

For this definition, among other authorities, Fretz v. Bull, 12 How. 466, 13 L. Ed. 1068 is cited, which citation is misleading; but these definitions might be multiplied indefinitely.

There is, too, other salvage than maritime, such as for property saved from impending danger from fire on land, etc.; but it will be noted that the underlying idea in all salvage, or an allowance reward or bounty to the salvor, is "for services in saving property from impending danger or imminent peril of loss to the owner, by one on whom no legal obligation rests to perform such service." The service to the schooner Jackson by the Merrimac was such service as is recognized and conceded in the present case by even the owners of the Jackson. The Merrimac was a passenger and freight steamer engaged in a legitimate business on a regular voyage. No obligation rested on her to remove derelicts from the track of commerce, except the duty owed to humanity and the safety of the business in which she was engaged. Other ships are charged with this duty. Changing her course at great inconvenience to her passengers and delay to the steamship in making her regular schedule, not being fitted for towing purposes, on one of the most dangerous parts of the Atlantic coast, with hidden, shifting sand shoals, just after a storm, when lightships and buoys are displaced, she changed her course and towed, by means of temporary rig-

ging, the derelict to a place of comparative safety, and anchored her in a bike of sufficient depth to enable her to ride out the night, stood by until the derelict was taken away by tugs summoned by the steamship, attended by the second officer of the Merrimac, and towed to a haven of safety. True, it was not accompanied by any great risk of life, further than the risk attending the danger of the steamship grounding in those dangerous waters with the shifting sand shoals, of which a chart cannot be made which can be relied on for any length of time, and becoming a partial, if not a complete, loss. This was heroic salvage service, to which the owners of the derelict schooner are indebted for all that was saved of their vessel and her cargo. Had a government ship come in contact with the derelict, she would have been dynamited or destroyed; and had she grounded on one of the sand shoals, 10 or 20 miles from shore, she and her cargo would have been as effectually lost.

What of the tugs? They came in compliance with a signal "for a tug" hoisted by the principal salvor, with apparently no view but a towage contract. They took no risk. The derelict was really saved before they were summoned, and the tugs rendered no service except a towage service—true, in aid of the salvor, but only in aid. They saved nothing, rescued nothing. There was no imminent danger to the derelict at the time they came, and they might have looked to the Merrimac in a civil action for services rendered at her instance and procurement. It was not a towing of a vessel in distress on the high seas, as all the cases' cited by the proctor for these tugs were, and in holding this was a mere towage, not a salvage service, entitling the tugs Blanche and Sanders to an allowance on this score, this court is not to be understood as controverting the principle decided in the cases cited by the proctor, but as deciding this case on the facts of the case and distinguishing it from the cases cited. The cases are easily distinguishable. It is frequently difficult to draw the distinction between a towage and a salvage service, which may commence as one and end as the other; but there does not seem to be any of the elements of a salvage service in that under consideration. The J. C. Pfluger (D. C.) 109 Fed. 93.

There is no fixed rule for salvage allowance. The old rule in cases of a derelict was 50 per cent. of the property salved; but under modern decisions and practice it may be less, or it may be more. The allowance rests in the sound discretion of the court or judge, who hears the case, hears the witnesses testify, looks into their eyes, and is acquainted with the environments of the rescue. Such judge or court is generally more competent to fix a fair and equitable allowance than an appellate court, by whom the allowance may be reviewed on appeal, and reduced or increased, at long range. An allowance for salvage should not be weighed in golden scales, but should be made as a reward for meritorious voluntary services, rendered at a time when danger of loss is imminent, as a reward for such services so rendered, and for the purpose of encouraging others in like services. It is not a result of contract or chaffering. The bitter remarks of the proctor for respondent touching the greed of those who flock around a ship

in distress and its effect on shipping to this port may be justified by facts known to the proctor, who resides and has resided from birth in Wilmington; but this is a misfortune of the port, not for consideration by the court. Such remarks are aliunde the record—a privilege of counsel. The court must at best attempt, with the lights set before it, by the admissions in the pleadings, the testimony of the witnesses, whom the court has seen and heard testify, the value of the property, both of the salvor and that salved, the risk to the former, and the benefit to the latter, to make, under the law of salvage, a fair and equitable allowance to the salvor, without oppression to the owners of the salved property; and considering the desperate condition of the Jackson, her masts down, without any means of navigation, at sea, in the track of ships, a menace to commerce—in short, in a condition to be destroyed by a revenue cutter as such menace—the action of the passenger steamer in rescuing her at a risk of $400,000 worth of property, to say nothing of her 75 passengers, the allowance of about 70 or 75 per cent. of the appraised value of the salved property, ship and cargo, which, notwithstanding the high character of the appraisers, seems to have been very low. The cost is not stated in the testimony; but she was repaired and is now sailing the seas, engaged in commerce, and the only testimony on this point is that intact this vessel was worth $50,000. But, taking the valuation or appraisement to be correct in her wrecked, water-logged condition, away from her home port, the allowance should be liberal. It was a minimum appraisement. In The Lyman M. Law (D. C.) 122 Fed. 816, $1,200 was adjudged proper as salvage by a passenger steamer valued at $160,000, a case very similar to the one at bar. In The Edith Allen, 129 Fed. 209, 63 C. C. A. 367, a salvage award of $6,500 for the rescue of a schooner and her cargo stranded on the coast of New Jersey was reduced on appeal by the Circuit Court of Appeals, Second Circuit, to $4,500, "because it appeared" to that court "to have been increased to some extent by a misapprehension by the trial judge of the facts shown by the evidence as to the peril of the stranded vessel."

There is no misapprehension of the facts in the case at bar. The court is familiar with the coast at Frying Pan Shoals and the dangers thereof, lurking below the surface of the waters. In fact, there is really no controversy on this point. The facts are not controverted. The Lamington, 86 Fed. 685, 30 C. C. A. 271, and The Myrtle Tunnel (D. C.) 155 Fed. 476, a wreck occurring on Frying Pan Shoals, will be found interesting reading as to allowances in the case of derelicts, which cases are commended to the proctors and other lawyers in derelict cases. The 50 per cent. rule is not absolute or binding on the court. The allowance may be more. The William Smith (D. C.) 59 Fed. 615. The expenses of towing, pumping, and guarding the vessel must first be paid to the parties who performed such services or paid such expenses; but those seem to go to the vessels or their owners, and are not to be divided among the crews. The Pfluger (D. C.) 109 Fed. 93.

It is ordered and decreed that the expenses incurred by the Merrimac in this behalf, of which an itemized bill is filed amounting to

$59.88, be allowed and paid; also $118 for towing the derelict to South-port, or Battery Island, the usual towing charge for taking a vessel to·Southport of this tonnage, plus 20 per cent. on account of probable increased power required by reason of the tow being water-logged,·be paid the fishing steamer Sanders. The following claims are to be al-lowed and paid:

To the Sanders:

| | |
|---|---|
| Towing derelict to a point off Southport | $ 98 00 |
| Extra on account of water-logged condition of tow | 100 00 |
| Paid watchman | 75 00 |
| | $263 00 |

To the steam tug Blanche:

| | |
|---|---|
| Towing derelict from Southport to Wilmington | $100 00 |
| Extra for water-logged condition of tow | 100 00 |
| Three days' working on Jackson, pumping, etc., at $50 per day | 150 00 |
| | $350 00 |

To the Merrimac:

| | |
|---|---|
| Salvage | $2,500 00 |
| To bill rendered as stated | 59 88 |
| | $2,559 88 |

This last allowance as salvage to be divided between the ship and the officers and crew, three-fifths to the vessel, or her owners, and two-fifths to the officers and crew of the steamship in ·proportion to their pay and·the services performed, of which the court has no evidence up-on which to base a division, being furnished with simply a list of the crew. The master or captain,·Thos. P. Pratt, and the second officer, seem to have been more the moving spirits in what meritorious services were rendered than other members of the ship's crew. If any evil had· come to the steamship Merrimac, they under the circumstances might have been held responsible therefor. The other officers and crew protested, hence these officers should be compensated accord-ingly. There being no data at hand upon which the court can make an equitable division of this allowance of two-fifths to the officers and crew, the matter, if it cannot be settled by agreement, will be refer-red to a commissioner for this purpose. The court has no hesitancy in saying, though it does not so hold at this time, these officers should have one-half of this two-fifths allowance, and the owners of the salv-ed property should consider they have gotten out of misfortune very fortunately and cheaply.